**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JO BELLE BALDONADO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 1:04-cv-04312 |
| | ) | |
| WYETH, et al., | ) | Honorable Amy J. St. Eve |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF WYETH'S MOTION TO EXCLUDE THE
TESTIMONY OF DRS. MATTHEW HOLLON AND ADRIANE FUGH-BERMAN**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Background ...................................................................................................................1

    I.      Dr. Hollon ......................................................................................1

    II.     Dr. Fugh-Berman ..........................................................................3

    III.    Relevant Testimony ......................................................................3

Argument ...................................................................................................................4

    I.      The Court should bar Drs. Hollon's and Fugh-Berman's testimony as irrelevant because there is no evidence that Plaintiff's physicians or Plaintiff herself relied on marketing in deciding to take HT. ...................4

    II.     The testimony of Drs. Hollon and Fugh-Berman is also irrelevant and inadmissible in regard to Plaintiff's punitive damages claim. ...............6

    III.    Drs. Hollon's and Fugh-Berman's narrative histories should be excluded because they will not assist the jury.........................................7

    IV.    These experts' opinions are not based on sufficient data or a reliable methodology. ...................................................................9

          A.     These experts have made no objective investigation of the facts. .............10

          B.     Dr. Hollon failed to gather relevant data. ...................................12

          C.     Dr. Hollon failed to adhere to scientific standards. ...................14

    V.     Dr. Hollon's testimony is improper speculation. ...................................15

    VI.    Dr. Hollon's standard of care testimony is inadmissible. .....................16

Conclusion ...................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bailey v. Wyeth*,
 2008 WL 2856146 (N.J. Super. Ct. July 11, 2008), *aff'd*, slip op. (N.J. App. Div.
 Sept. 29, 2011) ........................................................................................................11

*Barton v. Wyeth*,
 (Pa. Ct. Com. Pl. Oct. 5, 2009 A.M.) ........................................................................8

*Braun v. Lorillard Inc.*,
 84 F.3d 230 (7th Cir. 1996) ......................................................................................15

*Chudasama v. Mazda Motor Corp.*,
 123 F.3d 1353 (11th Cir. 1997) ..................................................................................6

*Claar v. Burlington N. R.R.*,
 29 F.3d 499 (9th Cir. 1994) ......................................................................................13

*Clark v. Takata Corp.*,
 192 F.3d 750 (7th Cir. 1999) ....................................................................................14

*Competitive Edge, Inc. v. Staples, Inc.*,
 763 F. Supp. 2d 997 (N.D. Ill. 2010) ........................................................................9

*Daubert v. Merrell Dow Pharmaceuticals., Inc.*,
 509 U.S. 579 (1993)........................................................................................1, 8, 14

*De Bouse v. Bayer AG*,
 922 N.E.2d 309 (Ill. 2009) ........................................................................................5

*DePaepe v. Gen. Motors Corp.*,
 141 F.3d 715 (7th Cir. 1998) ....................................................................................16

*Erickson v. Baxter Healthcare*, Inc.,
 131 F. Supp. 2d 995, 999 (N.D. Ill. 2001) ..............................................................14

*Esposito v. Wyeth*,
 slip op. (Fla. Cir. Ct. Apr. 14, 2010)..........................................................................1

*Gayton v. McCoy*,
 593 F.3d 610 (7th Cir. 2010) ......................................................................................9

*Harnett v. Ulett*,
 466 F.2d 113 (8th Cir. 1972) ....................................................................................17

*Hines v. Wyeth*,
    No. 2:04-0690 (S.D. W. Va. July 8, 2011) ........................................................................1, 16

*In re Baycol Prods. Litig.*,
    532 F. Supp. 2d 1029 (D. Minn. 2007)..........................................................................9, 16, 17

*In re Diet Drugs*,
    No. MDL 1203, 2000 WL 876900 (E.D. Pa. June 20, 2000) ................................................16

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)...................................................................................16

*In re Neurontin Mktg. Sales Practices & Prods. Liab. Litig.*,
    618 F. Supp. 2d 96 (D. Mass. 2009) ......................................................................................6

*In re Norplant Contraceptive Prods. Liab. Litig.*,
    1997 WL 81092 (E.D. Tex. Feb. 21, 1997) ..........................................................................5

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    1995 WL 273597 (E.D. Pa. Feb. 22, 1995) ..........................................................................5

*In re Prempro Prods. Liab. Litig. (Scroggin v. Wyeth)*,
    554 F. Supp. 2d 871 (E.D. Ark. 2008), *aff'd in relevant part*, 586 F.3d 547 (8th Cir.
    2009) ..............................................................................................................1, 8, 9, 11

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................ passim

*In re Seroquel Prods. Liab. Litig.*,
    2009 WL 223140 (M.D. Fla. Jan. 30, 2009) ..........................................................................5

*In re Trasylol Products Liability Litigation*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) ...................................................................9, 12, 16

*In re Viagra Prods. Liab. Litig.*,
    658 F. Supp. 2d 950 (D. Minn. 2009) ....................................................................................5, 9

*Kirk v. Michael Reese Hosp. & Med. Ctr.*,
    513 N.E.2d 387 (Ill. 1987) ......................................................................................................4

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)..............................................................................................................14

*Lea v. Wyeth*,
    No. 1:03-CV-01339-MAC (E.D. Tex. Sept. 16, 2011)..........................................................1

*Martin by Martin v. Ortho Pharm. Corp.*,
    661 N.E.2d 252 (Ill. 1996) ......................................................................................................4

*Meyers v. Nat'l R.R. Passenger Corp.*,
   648 F. Supp. 2d 1032 (N.D. Ill. 2009) ...................................................................13

*Miller v. Pfizer, Inc.*,
   196 F. Supp. 2d 1095 (D. Kan. 2002) ....................................................................5

*Palmas Y Bambu, S.A. v. E.I. DuPont de Nemours & Co.*,
   881 So. 2d 565 (Fla. Dist Ct. App. 2004) ...............................................................6

*Palsgraf v. Long Island R.R. Co.*,
   162 N.E. 99 (N.Y. 1928) ........................................................................................4

*Philip Morris U.S.A. v. Williams*,
   549 U.S. 346 (2007) ............................................................................................6, 7

*Prohias v. Pfizer, Inc.*,
   485 F. Supp. 2d 1329 (S.D. Fla. 2007) ..................................................................6

*Reeves v. Wyeth*,
   (E.D. Ark. Aug. 21, 2006) ......................................................................................1

*Rosen*,
   78 F.3d ...................................................................................................................17

*Rush v. Wyeth*,
   (E.D. Ark. Sept. 13, 2006) .....................................................................................1

*Se. Laborers Health & Welfare Fund v. Bayer Corp.*,
   655 F. Supp. 2d 1270 (S.D. Fla. 2009) ..................................................................6

*Smith v. Eli Lilly & Co.*,
   560 N.E.2d 324 (Ill. 1990) ..................................................................................4, 5

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
   538 U.S. 408 (2003) ................................................................................................6

*Susnis ex rel. Susnis v. Radfar*,
   739 N.E.2d 960 (Ill. App. 2000) ............................................................................5

*Torkie-Tork v. Wyeth*,
   (E.D. Va. Nov. 15, 2010) ...................................................................................1, 11

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ...................................................................................6

*United States v. Vance*,
   2011 WL 4372019 (N.D. Ill. July 5, 2011) .............................................................8

**STATUTES**

Due Process Clause...................................................................................7, 11

U.S. Const. Amend. I......................................................................................11

**OTHER AUTHORITIES**

Adriane J. Fugh-Berman, *The Haunting of Medical Journals: How Ghostwriting Sold
    "HRT,"* PLoS Medicine, vol. 7, issue 9 (Sept. 2010).......................................10, 11

Fed. R. Civ. P. 702 ..................................................................................... passim

Fed. R. Evid. 401 ...........................................................................................5

Katz, D., Caplan, A.L., Merz, J.E.,
    *All gifts large and small. Toward an understanding of the ethics of pharmaceutical
    industry gift giving* ...............................................................................2

Matthew F. Hollon, *Direct-to-Consumer Advertising: A Haphazard Approach to Health
    Promotion*, J. Am. Med. Ass'n 2030, 2032 (2005) ...............................................15

The Court should exclude the testimony of Drs. Matthew Hollon and Adriane Fugh-Berman pursuant to Fed. R. Civ. P. 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 592-93 (1993). Plaintiff Jo Belle Baldonado has designated these experts to testify about Wyeth's marketing practices for its hormone therapy ("HT") medications and how Wyeth supposedly brainwashed the entire medical community into prescribing HT excessively by exaggerating its benefits and understating its risks. The MDL court supervising federal HT litigation excluded, in whole or in part, the testimony of Drs. Hollon and Fugh-Berman in three bellwether cases,[1] and Dr. Hollon's testimony also has been excluded by other federal and state courts.[2]

## Background

### I.    Dr. Hollon

Dr. Hollon is a physician and an assistant professor at the University of Washington specializing in internal medicine.[3] He seeks to testify that "Wyeth irresponsibly failed to meet a reasonable standard of care for drug promotion, utilizing in excess the full catalogue of promotional strategies and activities to sell its menopausal hormonal supplementation program

---

[1]    *See* Ex. 1, Order, *Reeves v. Wyeth*, at 11 (E.D. Ark. Aug. 21, 2006) (ruling that Dr. Hollon could testify only during the punitive damages stage and, even then, could testify only about Wyeth's marketing practices that were "connected to [plaintiffs'] injur[ies]"); Ex. 2, Order, *Rush v. Wyeth*, at 11 (E.D. Ark. Sept. 13, 2006) (same); Ex. 3, Order, *Scroggin v. Wyeth*, at 6-8 (E.D. Ark. Nov. 15, 2007) (re-affirmed ruling barring Dr. Hollon's testimony in liability phase); Ex. 4, Order, *Scroggin v. Wyeth*, at 1 (E.D. Ark. Mar. 3, 2008) (barring Dr. Hollon's testimony in the punitive damages phase after supplemental briefing).

[2]    Ex. 5, *Esposito v. Wyeth*, slip op. at 1 (Fla. Cir. Ct. Apr. 14, 2010); Ex. 6, Hr'g Tr., *Torkie-Tork v. Wyeth*, at 100:17-101:20 (E.D. Va. Nov. 15, 2010) (ruling that Dr. Hollon could not testify regarding Wyeth's intent based on marketing practices and materials); and Hr'g Tr. at 206:5-6 (E.D. Va. Nov. 16, 2010) (ruling that "plaintiff must demonstrate actual reliance for [marketing materials] to be relevant"); Ex. 7, Op. & Order, *Hines v. Wyeth*, at 9, No. 2:04-0690 (S.D. W. Va. July 8, 2011) ("Dr. Hollon's testimony concerning defendants' marketing strategy is irrelevant to plaintiff's case and therefore inadmissible."); Ex. 8, Order, *Lea v. Wyeth*, at 6-7, No. 1:03-CV-01339-MAC (E.D. Tex. Sept. 16, 2011) (ruling that the proffered testimony of Drs. Hollon and Fugh-Berman was "irrelevant in this case because Plaintiff 'cannot demonstrate that she personally would have avoided harm had [Defendants] marketed their drugs more appropriately.' Neither Plaintiff nor [her prescriber] testified that they relied on Defendants' marketing materials.").

over several decades to all menopausal women, some of whom were harmed as a direct result."[4] The majority of his report is a recapitulation of Wyeth internal documents, sprinkled with editorial comments like "Wyeth continued to look for ways to avoid principles of sound and responsible advertising and marketing."[5]  Dr. Hollon asserts that Wyeth's promotional practices and marketing manufactured  a "conventional wisdom" about HT and accuses Wyeth of the "medicalization" of menopause through marketing "targeting physicians and patients together."[6] He opines that "'physicians rely heavily on [pharmaceutical company] detailers for information,'" and that even small gifts by detailers "may powerfully influence physician prescribing behavior."[7]  Most doctors deny this, but Dr. Hollon claims to know better; he says that interactions with detailers increase "irrational" prescribing decisions.[8]  Dr. Hollon also claims that, by allegedly "ghostwriting" articles, consulting companies "assisted" Wyeth "in controlling and influencing the published scientific information about hormone supplementation that most clinicians ultimately relied on to make their best possible decisions."[9]

Dr. Hollon's report does not mention Plaintiff or her prescribing physicians; indeed, he has no information about them.  Thus, Dr. Hollon does not know what HT medications Plaintiff took, why she took HT, what information she or her prescribing physicians had and relied upon about HT, or where that information originated.

---

[3]     Ex. 9, Report of Matthew Hollon, Feb. 15, 2006 ("Hollon Report"), at 1.
[4]     *Id.* at 4.
[5]     *Id.* at 35.
[6]     *Id.* at 8, 42, 87.
[7]     *Id.* at 14, 16-17 (citing Katz, D., Caplan, A.L., Merz, J.E., *All gifts large and small. Toward an understanding of the ethics of pharmaceutical industry gift giving*).
[8]     *Id.* at 17.
[9]     *Id.* at 64.

## II.    Dr. Fugh-Berman

Dr. Fugh Berman is a physician and associate professor in the department of physiology and biophysics at the Georgetown University Medical Center.[10]   She is one of several experts identified routinely by plaintiffs in HT cases, but she is never called to testify.  The substance of her report mirrors Dr. Hollon's, and does not address Plaintiff.

## III.    Relevant Testimony

Plaintiff alleges that she took Prempro from May 1996 to September 1998.[11]   Her prescribing physician, Dr. Avila, testified that, in prescribing a medication, she takes into account the patient's current symptoms, medical history, and family history and uses her best medical judgment when deciding whether or not to prescribe a drug to a patient.[12]   Prior to prescribing Prempro to Plaintiff, Dr. Avila could not recall seeing any advertisements for HT.[13]   Significantly, Dr. Avila testified that she did not rely on any marketing materials in making the decision to prescribe Prempro to Plaintiff.[14]   Dr. Avila also did not rely on pharmaceutical sales representatives in prescribing Prempro to Plaintiff.  Specifically, Dr. Avila testified that "you don't rely on them" and "you don't depend on whatever data they are handing you because in the final analysis you are the one who gets to see the patient."[15]   Accordingly, Dr. Avila prescribed appropriate medication for her patients based on her own clinical judgment; she did not change how she treated individual patients based on her interactions with sales representatives.[16]

---

[10]    Ex. 10, Report of Adriane J. Fugh-Berman, Feb. 16, 2006, at 1.

[11]    *See* Ex. 11, Pl.'s Fact Sheet at 33.

[12]    *See* Ex. 12, Deposition of Teresita Avila, August 10, 2011 ("8/10/11 Avila Dep."), at 252:17-253:21.

[13]    *See* Ex. 13, Deposition of Teresita Avila, July 20, 2011 ("7/20/11 Avila Dep."), at 87:8-15.

[14]    *Id.* at 256:21-257:11.

[15]    *Id.* at 21:20-22:16.

[16]    Ex. 12, 8/10/11 Avila Dep. at 203:13-204:12.

Likewise, Dr. Akkineni, who continued to prescribe Prempro to Plaintiff, made her prescribing decisions based on her own medical judgment.[17] Dr. Akkineni further confirmed that she did not recall seeing any ads for HT or relying on any Wyeth marketing or sales materials in prescribing Prempro for Plaintiff.[18]

And although Plaintiff testified that she saw two advertisements or articles about HT prior to being prescribed Prempro, she stated that she ultimately relied upon her doctor's judgment in making the decision to take Prempro.[19]

## Argument

I.  **The Court should bar Drs. Hollon's and Fugh-Berman's testimony as irrelevant because there is no evidence that Plaintiff's physicians or Plaintiff herself relied on marketing in deciding to take HT.**

Under the governing substantive law of Illinois, Plaintiff must establish that Wyeth deceived Plaintiff's physicians. *See Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392-93 (Ill. 1987) ("The doctor, functioning as a learned intermediary between the prescription drug manufacturer and the patient, decides which available drug best fits the patient's needs and chooses which facts from the various warnings should be conveyed to the patient. . . ."); *see also Martin by Martin v. Ortho Pharm. Corp.*, 661 N.E.2d 252, 354 (Ill. 1996). There is no legal basis to admit expert testimony that Wyeth's marketing practices allegedly deceived the medical community generally; Plaintiff must establish that a breach of duty by Wyeth caused ***her*** injuries. *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 99-100 (N.Y. 1928) (Cardozo, J.) ("'Proof of negligence in the air, so to speak, will not do.' . . . What the plaintiff must show is 'a wrong' to herself, *i.e.*, a violation of her own right, and not merely a wrong to someone else.") (citation omitted); *accord Smith v. Eli Lilly & Co.*, 560 N.E.2d 324, 328 (Ill. 1990) ("In a

---

[17]     *See* Ex. 14, Deposition of Mani Akkineni, July 20, 2011, at 115:13-116:7.
[18]     *Id.* at 162:18-24.

negligence action [the] causation-in-fact requirement entails a reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered."). Moreover, "[a] fundamental principle of tort law is that the plaintiff has the burden of proving by a preponderance of the evidence that the defendant caused the complained-of harm or injury; mere conjecture or speculation is insufficient proof." *Smith*, 560 N.E.2d at 328; *see also Susnis ex rel. Susnis v. Radfar*, 739 N.E.2d 960, 967 (Ill. App. 2000) ("[T]he mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause. The causal connection must not be contingent, speculative or merely possible.").

Applying these principles, Plaintiff must demonstrate that the marketing evidence discussed by Drs. Hollon and Fugh-Berman was relied upon by her doctors. But it is undisputed that Drs. Avila and Akkineni did not rely on any marketing materials in deciding to prescribe HT. Thus, these experts' opinions should be barred as irrelevant under Federal Rule of Evidence 401. *See De Bouse v. Bayer AG*, 922 N.E.2d 309, 316 (Ill. 2009) ("If a consumer has neither seen nor heard" any "statement or omission" in a pharmaceutical manufacturer's advertising—either directly or indirectly through her prescribing physician—then "she cannot have relied on the statement and, consequently, cannot prove" that advertising "proximately caused any damages"). Indeed, courts routinely exclude marketing evidence absent proof of reliance.[20]

---

[19]     *See* Ex. 15, Deposition of Jo Belle Baldonado, May 6, 2009, at 28:17-19, 43:16-19.

[20]     *See, e.g., In re Seroquel Prods. Liab. Litig.*, 2009 WL 223140, at *5 (M.D. Fla. Jan. 30, 2009) (excluding marketing evidence because the plaintiffs "ha[d] not shown that their prescribing physicians were exposed to the promotional materials"); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 966 (D. Minn. 2009) (excluding certain marketing testimony from Dr. Blume, one of Plaintiff's experts in this case, because, absent evidence that plaintiffs actually saw advertisements, advertising-related documents are "irrelevant and excludable"); *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1095, 1123 n.92 (D. Kan. 2002) (excluding marketing materials not relied on by prescriber as "irrelevant and unfairly prejudicial"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 1997 WL 81092, at *1 & n.5 (E.D. Tex. Feb. 21, 1997) ("Absent evidence that the physicians were exposed to the [promotional] materials, the court finds that the promotional and advertising materials are not relevant evidence."); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1995 WL 273597, at *11 n.13 (E.D. Pa. Feb. 22, 1995) ("each plaintiff has the burden of showing that either [defendant] promoted/marketed its medical device to plaintiff's particular doctor or

Furthermore, outside the context of securities law, the theory that a defendant's representations were so pervasive that it can be presumed they affected the entire market (i.e. fraud-on-the-market) cannot substitute for proof of actual reliance. *See, e.g.*, *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270, 1283 (S.D. Fla. 2009) (rejecting proof through fraud-on-the-market doctrine because it is "a creature of limited securities fraud actions" and is predicated on "an efficient market theory" that does not apply to the prescription drug market); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1369 n.39 (11th Cir. 1997) ("The fraud on the market theory of securities law . . . is based on concepts and policies that simply do not apply in a products liability case.").[21]

## II.    The testimony of Drs. Hollon and Fugh-Berman is also irrelevant and inadmissible in regard to Plaintiff's punitive damages claim.

Even if the testimony of Drs. Hollon and Fugh-Berman were offered only in support of Plaintiff's punitive damages claim, it would still be inadmissible. In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 422-23 (2003), the Supreme Court held that "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished ***for the conduct that harmed the plaintiff***, not for being an unsavory individual or business." (Emphasis added). The Supreme Court reaffirmed this principle in *Philip Morris U.S.A. v.*

---

surgeon for" an off-label use "and that such promotion caused the surgeon to decide" to use the device for an off-label purpose).

[21]    *Accord UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010) ("generalized proof of reliance by doctors cannot complete the causation chain"); *In re Neurontin Mktg. Sales Practices & Prods. Liab. Litig.*, 618 F. Supp. 2d 96, 112 (D. Mass. 2009) (even where plaintiffs allege "pervasive promotions, the prescription drug industry is too dissimilar from the securities market to support applying a 'fraud on the market' theory to establish a rebuttable presumption that physicians relied on a national drug marketing campaign"); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1339-40 (S.D. Fla. 2007) (proof of causation requires an "individualized inquiry into the [association's] members' reason for buying Lipitor"); *Palmas Y Bambu, S.A. v. E.I. DuPont de Nemours & Co.*, 881 So. 2d 565, 573 (Fla. Dist. Ct. App. 2004) (rejecting recovery on a "body of public information" theory that would "relax the reliance requirement").

*Williams*, 549 U.S. 346, 353 (2007), holding that the Due Process Clause prohibits a state from using punitive damages "to punish a defendant for injury that it inflicts upon nonparties." The Supreme Court explained that the danger of such testimony is that "[t]he jury will be left to speculate" about the exact nature of the injuries to the nonparties and thus "the fundamental due process concerns to which our punitive damages cases refer—risks of arbitrariness, uncertainty and lack of notice—will be magnified." *Id*. at 354.

Here, there is no evidence that Plaintiff was harmed by any conduct involving Wyeth's advertising or marketing. Drs. Hollon and Fugh-Berman therefore can only testify generally that the marketing practices were "bad." If they are allowed to testify that physicians and patients in this country were influenced by such practices, the jury will be left to speculate as to how many were harmed, how seriously they were harmed, and under what circumstances. This would import to the trial the very due process concerns—arbitrariness, uncertainty, and lack of notice— that led the Supreme Court to prohibit such evidence in *Philip Morris*.

**III.  Drs. Hollon's and Fugh-Berman's narrative histories should be excluded because they will not assist the jury.**

The vast majority of Drs. Hollon's and Fugh-Berman's expert reports simply present a selective narrative summary, ostensibly of Wyeth's promotion of HT. Dr. Hollon devotes more than 50 pages of his report to a one-sided chronology of Wyeth's promotional efforts, derived from a patchwork of documents and accompanied by *ipse dixit* opinions about the impropriety of Wyeth's actions. His proposed testimony includes a "Detailed Chronological Summary of [Wyeth's] Promotional Campaign" for HT, derived entirely from documents provided to him by counsel for HT plaintiffs.[22]

---

[22]      Ex. 9, Hollon Report at 42.

These experts' summaries of Wyeth documents do not involve any application of "scientific, technical or other specialized knowledge" as required by Rule 702, but simply amount to "spin" on Wyeth's conduct or interpretations of documents that the jury is capable of interpreting itself. Such testimony will not "assist the trier of fact," as required by Rule 702 and *Daubert*, because the jury does not need an expert to interpret these documents, to the extent they are even admissible. *See, e.g.*, *United States v. Vance*, 2011 WL 4372019, at *5 (N.D. Ill. July 5, 2011) ("allowing [expert] to testify based on nothing more than his review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself"). Recognizing this, the MDL court and several other courts in the HT litigation have excluded this proposed marketing testimony.[23] The MDL court reasonably inquired: "If an expert does nothing more than read exhibits, is there really any point in her testifying as an expert?" *In re Prempro Prods. Liab. Litig. (Scroggin v. Wyeth)*, 554 F. Supp. 2d 871, 886 (E.D. Ark. 2008), *aff'd in relevant part*, 586 F.3d 547 (8th Cir. 2009). Such "expert" testimony will not aid the jury and will impermissibly interfere with its role as trier of fact.

---

[23]     *See* notes 1 and 2, *supra*. Although Dr. Hollon was permitted to testify in *Barton v. Wyeth*, his testimony there vividly demonstrates that his opinions are not proper expert testimony. The majority of his testimony consisted of reading verbatim from documents written by others, none of which had any connection to the plaintiff's physician, and then offering an argumentative gloss. For example, he testified—on the basis of a book that the plaintiff's physician was never asked about but that plaintiff's counsel argued was relevant because "the whole medical community has the same information"—that Wyeth was able "to get what were core promotional messages . . . as part of their marketing campaign into all the facets, the full catalog of information that we as health care providers might rely upon." Ex. 16, Tr. *Barton v. Wyeth*, at 41-42, 101 (Pa. Ct. Com. Pl. Oct. 5, 2009 A.M.); Ex. 17, Tr. *Barton v. Wyeth*, at 37-39 (Pa. Ct. Com. Pl. Oct. 5, 2009 P.M.); Ex. 18, Tr. *Barton v. Wyeth*, at 63-64 (Pa. Ct. Com. Pl. Oct. 14, 2009 A.M.). He also testified, based on his review of "call notes of sales representatives of Wyeth from all over the country"—except, presumably, those who actually called on the plaintiff's physicians, which did not mention off-label benefits—that Wyeth sales representatives "were going in and talking about what were considered off-label benefits." Ex. 19, Tr. *Barton v. Wyeth*, at 84-86 (Pa. Ct. Com. Pl. Oct. 15, 2009 A.M.).

Courts routinely preclude testimony like that offered by Drs. Hollon and Fugh-Berman. As the MDL court has recognized, "[h]aving an expert witness simply summarize a document (which is just as easily summarized by a jury) with a tilt favoring a litigant, without more, does not amount to expert testimony." *Scroggin*, 554 F. Supp. 2d at 887. Similarly, in *In re Trasylol Products Liability Litigation*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010), the court barred the narrative histories presented by another one of Plaintiff's experts here, Dr. Parisian, noting her "factual narrative of regulatory history and summaries" of the defendant's internal documents improperly invaded the province of the jury. Likewise, in *In re Viagra Products Liability Litigation*, 658 F. Supp. 2d at 967 (D. Minn. 2009), the court excluded an expert's "advocacy-based interpretation of the documents in the record concerning regulatory activity" because the jury was equally capable of "interpret[ing] the documents that [she] highlights in her report."[24]

## IV. These experts' opinions are not based on sufficient data or a reliable methodology.

Drs. Hollon's and Fugh-Berman's testimony should also be excluded because it does not come close to the standard for reliability required by Rule 702 and Seventh Circuit case law, which require that an expert's opinion be "based upon sufficient facts or data" and "the product of reliable principles and methods," and that the expert apply "the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see also Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1007 (N.D. Ill.

---

[24] *See also In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1067 (D. Minn. 2007) (noting that drug manufacturer's "motives as to how it proceeded with evaluating [the drug's] toxicity, and its reactions to its toxicologists' warnings are issues that can be decided by the jury, without expert assistance"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (concluding that "glosses" on internal documents by a paid expert are simply "inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of the case," and should be excluded because admission would do "'no more than counsel for plaintiff will do in argument, *i.e.*, propound a particular interpretation of [defendant's] conduct'") (citation omitted).

2010) (under Rule 702 and Seventh Circuit law, "the expert's reasoning or methodologies underlying the testimony must be scientifically reliable") (quoting Rule 702).

### A.  These experts have made no objective investigation of the facts.

Dr. Hollon has made no objective investigation of the facts, and instead bases his opinions on material hand-picked for him by HT plaintiffs' counsel.  He then "randomly" delves into this limited material and, finding nothing to disprove his views, offers them as expert opinions:

> Well, the documents that were sent to me were definitely sent by the plaintiffs.  I recognize that.  I also was sent a hard drive that included documents that weren't there, and ***I don't know, honestly, if that represents a complete universe or not. . . . I tried my best to just randomly select documents from the hard drive that would—if I could find something that would serve as a counter to the opinions that I form in here***, I looked for those documents on the hard drive, and then went back to look in the medical literature, as well, and in the popular literature, using like LexisNexis databases or things like that.  ***And surprisingly, I wasn't able to find any compelling documents that would counter the opinions—the professional opinions that are presented in my report.***[25]

Thus, because the material selected for Dr. Hollon by plaintiffs' counsel did not "compellingly" prove him wrong, Dr. Hollon presumes he must be right.  Such an opinion is not the product of independent thought and research, but is simply a foregone conclusion.

For her part, Dr. Fugh-Berman "published" in an on-line journal a paper entitled *The Haunting of Medical Journals: How Ghostwriting Sold "HRT,"*[26] which is critical of the "lawful" practice of "ghostwriting," *Scroggin*, 586 F.3d at 557, a practice protected by the Due

---

[25]    *See* Ex. 20, 3/27/06 Deposition of Matthew Hollon ("Hollon Dep.") at 67:4-68:6 (emphases added).  Dr. Hollon has not been deposed in this case.  Although this testimony was given in another case, Dr. Hollon has not altered his generic report based on any individual facts.

[26]    *See* Ex. 21, Adriane J. Fugh-Berman, *The Haunting of Medical Journals: How Ghostwriting Sold "HRT,"* PLoS Medicine, vol. 7, issue 9 (Sept. 2010) at 9 ("Marketing messages in credible journals have

10

Process Clause and the First Amendment. Dr. Fugh-Berman echoes HT plaintiffs' theme that so-called "ghostwriting" is symptomatic of Wyeth's campaign to over-promote HT.

Although HT plaintiffs have leveled the "ghostwriting" charge since the earliest days of the litigation, they have not identified any inaccuracies in such articles. Indeed, "[t]here is no evidence that Wyeth . . . supported articles that it knew were false or misrepresented the science," *Scroggin*, 554 F. Supp. 2d at 897, and "there is no dispute that the articles were subject to a rigorous peer review process and were factually and medically sound." *Bailey v. Wyeth*, 2008 WL 2856146, at *20 (N.J. Super. Ct. July 11, 2008), *aff'd*, Slip Op. (N.J. App. Div. Sept. 29, 2011) (attached as Ex. 22).[27]

Far from demonstrating that Dr. Fugh Berman is qualified as an expert regarding pharmaceutical marketing practices generally, or "ghostwriting" specifically, her publication reveals that she is simply a mouthpiece for HT plaintiffs' counsel. She did not conduct independent research, but derived the content for her paper largely from the work product of plaintiffs' counsel. Indeed, Dr. Fugh Berman acknowledges plaintiffs' attorney James Szaller in her paper for supplying a document that "was an invaluable resource."[28] This attorney work product is not the kind of material that true marketing experts rely upon to form opinions in their

---

almost certainly contributed to wide-spread use of HT among millions of women who had no medical indication for the drug.").

[27] Moreover, "the term 'ghostwritten' is fraught with ambiguity and potential overbreadth and prejudice." *See* Ex. 6, Trial Tr., *Torkie-Tork v. Wyeth*, at 210:3-4 (E.D. Va. Nov. 16, 2010). "Ghostwriting" would normally mean that "Wyeth actually wrote the article, sent it to the doctor, and said, 'Here's the articles for you to send in the New England Journal of Medicine' and the doctor sends it in and gets it published under his name . . . ." *Id.* at 210:17-21. That did not happen here; instead, legitimate medical-writing companies were hired to furnish editorial assistance to well-established authors who exercised complete control over the published form and content of their articles.

[28] *See* Ex. 21, *The Haunting of Medical Journals: How Ghostwriting Sold "HRT"* at 9; *see also id.* at 6 ("All documentation of ghostwriting is taken from Szaller J., Wyeth's hormone therapies & ghostwritten medical literature (unpublished manuscript), with permission.").

11

day-to-day practice; instead, it is attorney-generated propaganda couched as expert opinion. *See, e.g.*, *In re Trasylol*, 709 F. Supp. 2d at 1346, 1351; *In re Rezulin*, 309 F. Supp. 2d at 546.

**B.**      **Dr. Hollon failed to gather relevant data.**

Dr. Hollon proposes to testify that "Wyeth irresponsibly failed to meet a reasonable standard of care for drug promotion" and, as a result, "harmed" women.[29]  But the methodology he used in preparing his report is entirely unreliable and unscientific.  In a deposition in another HT case, Dr. Hollon admitted that he:

- failed to review the medical records or deposition of the plaintiff or the deposition of the plaintiff's prescriber;[30]

- did not know what, if any, promotional materials were seen by the plaintiff's prescriber;[31]

- did not know why the plaintiff, or any other woman, was prescribed HT;[32]

- could not say whether the plaintiff, or any other woman, was inappropriately prescribed HT as a result of Wyeth's promotional efforts;[33]

- did not know whether the plaintiff saw any promotional materials;[34]

- had not undertaken any study to determine the extent to which Wyeth's promotional activities influenced patient behavior;[35]

- did not know of research that answers the question of whether the benefits of direct-to-consumer advertising outweigh the danger that consumers will demand and use medicines inappropriately;[36]

- did not know how many, if any, published articles on HT were influenced by Wyeth;[37]

---

[29]      Ex. 9, Hollon Report at 4.
[30]      *See* Ex. 20, Hollon Dep. at 151:3-21; 70:4-14.
[31]      *Id*. at 160:25-161:4.
[32]      *Id*. at 151:8-14, 157:3-22.
[33]      *Id*. at 147:10-151:2.
[34]      *Id*. at 153:10-19.
[35]      *Id*. at 61:24-64:22, 66:3-17, 185:12-186:11.
[36]      *Id*. at 187:4-190:3.

- could not identify any specific data that Wyeth allegedly "manufactured."[38]

Dr. Hollon's proposed testimony in this case is based on the same flimsy foundation.[39] His failure to review, or even obtain, the necessary evidence renders his opinions nothing but "subjective belief or unsupported speculation." *Meyers v. Nat'l R.R. Passenger Corp.*, 648 F. Supp. 2d 1032, 1041 (N.D. Ill. 2009). An expert "may not reach his conclusion first and do the research later"—or not at all. *In re Rezulin*, 309 F. Supp. 2d at 550; *see also Claar v. Burlington N. R.R.*, 29 F.3d 499, 502-03 (9th Cir. 1994).

Dr. Hollon's opinion that Wyeth repeatedly ignored the FDA's directives regarding HT advertisements further illustrates his cavalier approach to facts. He did not obtain all the facts about those ads, including when they ran, where they ran, or even whether they ran at all.[40] He is not familiar with the correspondence file between Wyeth and the FDA, and instead bases his opinion on his "sense" of what happened.[41]

A centerpiece of Dr. Hollon's testimony is that Wyeth's alleged over-promotion of HT "[e]roded the traditional role of the physician as a 'learned intermediary'" by "exert[ing] profound control over the dissemination of the entire body of medical and scientific literature regarding menopausal hormone supplementation."[42] But he admits that he cannot quantify the extent to which Wyeth allegedly influenced the medical literature, and, in fact, has not even

---

[37]     *Id*. at 324:3-325:4.
[38]     *Id*. at 417:12-418:12.
[39]     Ironically, for someone who opines that Wyeth's promotion of HT was not scientifically supported, Dr. Hollon failed to review relevant sources of information about HT use, such as the National Guideline Clearinghouse, although he admitted that it is a "good starting place" for information about guidelines, *id*. at 132:23-133:17, or the Cochran database of systematic reviews, although he acknowledged that it is "a model for all systematic reviews." *Id*. at 133:20-135:1. Nor did he review the clinical practice guidelines issued by various professional medical organizations. *Id*. at 129:8-130:10.
[40]     *See id*. at 270:12-274:1, 280:2-281:10, 284:11-287:10.
[41]     *Id*. at 232:20-233:16.
[42]     Ex. 9, Hollon Report at 3, 32.

attempted to do so, relying instead on pure speculation. For example, when asked whether he had done a comprehensive analysis of the HT literature to determine how many, if any, articles on HT were actually funded by Wyeth, Dr. Hollon responded, "[w]ell, you know, this was a piece of the overall marketing plan that influenced providers and patients together. . . . It's reasonable **to suppose** that they continued to invest in it because it was effective."[43]

Similarly, although Dr. Hollon alleges that a consultant improperly "assisted Wyeth in controlling and influencing the published scientific information about hormone supplementation" by "ghost-writing" articles,[44] he admits that his opinion hinges on a single article that he did not even read.[45] In this litigation, Dr. Hollon draws the conclusions that he is asked to draw by plaintiffs' counsel, whether or not he has supporting facts. Reliable methodology requires the facts to come **before** the opinions.

## C.     Dr. Hollon failed to adhere to scientific standards.

The objective of the reliability standards imposed by *Daubert* is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Clark v. Takata Corp.*, 192 F.3d 750, 756 (7th Cir. 1999) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). Courts may consider a nonexhaustive list of four factors in assessing reliability: testability, peer review and publication, evaluation of potential rate of error, and degree of acceptance in relevant scientific community. *See, e.g.*, *Erickson v. Baxter Healthcare, Inc.*, 131 F. Supp. 2d 995, 999 (N.D. Ill. 2001) (citing *Daubert*, 509 U.S. at 593-94).

Dr. Hollon fails to meet these standards. In various opinion pieces he has published, Dr. Hollon acknowledges that the safety and net benefit of direct-to-consumer advertising remains

---

[43]     *See id.* at 324:9-22 (emphasis added).
[44]     *Id.* at 321:8-10.

14

unclear.  In an editorial published in JAMA, he states that the answer to whether or not the benefits of direct-to-consumer advertising "outweigh the danger that consumers will demand and use medicines inappropriately . . . ***appears equivocal and it awaits further research***."[46]  Here, in contrast, Dr. Hollon is prepared to testify "beyond a reasonable doubt" that Wyeth's direct-to-consumer advertisements resulted in doctors inappropriately prescribing HT.[47]  By giving an equivocal answer to JAMA and then offering an unequivocal answer in this litigation, Dr. Hollon is applying different standards in the courtroom than those applied in his professional practice. Moreover, in the five years since he was retained as an expert in the HT litigation, he has never subjected his opinions (and accordingly his methodology) regarding Wyeth's advertising to peer review.  That Dr. Hollon is willing "to testify for a fee to propositions that [he has] not arrived at through the methods . . . [he uses] when [he is] doing [his] regular professional work" raises an insurmountable bar to the admission of such testimony in this case.  *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996).

## V.       Dr. Hollon's testimony is improper speculation.

Dr. Hollon has testified that "the bulk of [his] evaluation and summary opinion about Wyeth comes from the overarching intentions of their marketing campaign," and he peppers his report with his personal opinions about Wyeth's intent.[48]  But Wyeth's internal motivations are

---

[45]       *Id*. at 312:25-313:8.

[46]       Ex. 22, Matthew F. Hollon, *Direct-to-Consumer Advertising: A Haphazard Approach to Health Promotion*, 293 J. Am. Med. Ass'n 2030, 2032 (2005) (emphasis added).  Although Dr. Hollon stays "really current on research" in this area, he is not aware of any research since his JAMA editorial, either generally or with regard to Wyeth's promotion of HT.  Ex. 20, Hollon Dep. at 187:16-190:3.  He views randomized controlled studies as "the highest standard of evidence," but admits that the only such study to date on the influence of direct-to-consumer advertising was inconclusive.  *Id*. at 130:16-17, 182:13-22.

[47]       Hollon Dep. at 275:4-25.

[48]       *See* Ex. 20, Hollon Dep. at 258:25-259:3; *see, e.g.*, Ex. 9, Hollon Report at 83 ("by exaggerating the gravity of osteoporosis, Wyeth sought to create fear that would drive otherwise healthy, asymptomatic women to physicians to request hormone supplementation"); *id*. at 48 ("The intention of the program was to use the article as a, 'hook whereby our media trained physicians will gain access to the media.'").

not within Dr. Hollon's personal knowledge and his speculative opinion therefore should be excluded. [49]

Courts repeatedly have excluded expert testimony regarding another's state of mind, motive, and intent. *See, e.g.*, *In re Baycol*, 532 F. Supp. 2d at 1054 (excluding the testimony of an expert "to the extent that he speculates as to [defendant]'s motive, intent or state of mind, or speculates as to motives of the FDA or what other drug companies would do"); *In re Trasylol*, 709 F. Supp. 2d at 1347 (holding that an expert (Dr. Parisian) "ha[d] no expertise that allow[ed] her to infer [Defendant's] and the FDA's knowledge and intent and present those inferences to the jury"); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (granting a motion to preclude Dr. Parisian from offering such testimony, stating that "the knowledge, motivations, intent, state of mind, or purposes of [a company], its employees, the FDA, or FDA officials" is "not a proper subject for expert or even lay testimony" and that "regulatory expertise does not give [an expert] the ability to read minds"). [50] Thus, regardless of the admissibility of the Wyeth documents on which Dr. Hollon relies, his testimony about the "meaning" of such documents is inadmissible.

## VI. Dr. Hollon's standard of care testimony is inadmissible.

Dr. Hollon's opinions regarding the standard of care for pharmaceutical marketing are not based on the legal standard embodied in federal pharmaceutical regulations, which he claims

---

[49] The Court in *Hines v. Wyeth*, which excluded Dr. Hollon's testimony in its entirety, *see supra* note 2, also excluded the testimony of Plaintiffs' experts Drs. Parisian and Blume in part because "Dr. Parisian has no knowledge concerning defendants' state of mind or intent." Ex. 7, Op. & Order, *Hines v. Wyeth*, at 16-17, No. 2:04-0690 (S.D. W. Va. July 8, 2011). The same rationale applies here.

[50] *Accord DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (expert "lacked any scientific basis for an opinion about the motives of GM's designers"); *In re Rezulin*, 309 F. Supp. 2d at 546-47 ("expert" opinions regarding "intent, motives or states of mind . . . have no basis in any relevant body of knowledge or expertise"; "improperly [seek] to assume the role of advocates for the plaintiffs' case"; relate to matters that the jury is capable of understanding without the expert's help; and "impermissibly embrace[] a legal conclusion") (footnotes omitted); *In re Diet Drugs*, No. MDL 1203,

"may not sufficiently reflect what's a reasonable standard of care," but are instead based on "principles of primary prevention."[51] The sole source that he cites for these principles is his own opinion piece in one journal. In other words, he is offering his own views on marketing ethics. He has not conducted any research, testing, or other objective gathering of facts, or identified any research or analysis by others that support the standard he seeks to apply.[52] Dr. Hollon also opines that Wyeth breached the standard of care that he claims is applicable to its marketing.[53]

Under Rule 702, when offering opinion testimony, experts must "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen*, 78 F.3d at 318. Numerous courts have rejected inherently subjective expert opinions about the standard of care.[54] These cases are instructive and support the exclusion of Dr. Hollon's testimony. The Court should allow the jury to decide these issues based on jury instructions, as opposed to the personal views of Dr. Hollon.

### Conclusion

For all of the reasons set forth above, the Court should exclude the testimony of Drs. Matthew Hollon and Adriane Fugh-Berman.

---

2000 WL 876900, at *2, *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts.").

[51]  *See* Ex. 20, Hollon Dep. at 262:6-18.

[52]  *See id.* at 64:6-66:17.

[53]  *See* Ex. 9, Hollon Report at 4, 30, 32.

[54]  *See, e.g.*, *Harnett v. Ulett*, 466 F.2d 113, 118 (8th Cir. 1972) (excluding expert testimony on ethics because "it invaded the province of the jury," had "no clearcut standards," and was "a personal opinion rather than that of an expert"); *In re Baycol*, 532 F. Supp. 2d at 1053 ("Personal views on corporate ethics and morality are not expert opinions."); *In re Rezulin*, 309 F. Supp. 2d at 543 (excluding ethics testimony that was "based on [the proposed experts'] personal, subjective views").

Dated: February 21, 2012

Respectfully submitted,

By: ___/s/ Nathan E. Hoffman_____

Dan K. Webb
Erik W. Snapp
Nathan E. Hoffman
Winston & Strawn LLP
35 West Wacker Dr.
Chicago, IL 60601
nhoffman@winston.com

*Attorneys for Wyeth*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Memorandum in Support of Wyeth's Motion to Exclude the Testimony of Drs. Matthew Hollon and Adriane Fugh-Berman** was served by e-mail and first class mail, postage prepaid, this 21st day of February, 2012, on the following counsel of record:

Bryan F. Aylstock
Debra Renee Sherrer Baggett
Aylstock, Witkin, Kreis & Overholtz,
PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
BAylstock@awkolaw.com
RBaggett@awkolaw.com