IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JO BELLE BALDONADO, | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 4312 |
| WYETH *and its division,* | ) | |
| WYETH PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Jo Belle Baldonado was diagnosed with breast cancer while she was taking

Prempro, a prescription hormone therapy medication that Defendant Wyeth designed,

manufactured, and marketed. Alleging that Defendant's hormone therapy products including

Prempro caused her breast cancer, Plaintiff filed the present civil action against Defendant and

others. This case is one of thousands of similar cases nationwide that individuals have filed

against Defendant. The case is set for trial on October 9, 2012.

Before the Court is Defendant's motion *in limine* to exclude the expert testimony of Dr.

Randall Patten, M.D., pursuant to Rule 702 of the Federal Rules of Evidence, and the Supreme

Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct.

2786, 125 L. Ed. 2d 469 (1993). For the reasons explained below, the Court grants Defendant's

motion.

1

**BACKGROUND**

I.      **Menopausal Hormone Therapy Products**

This litigation concerns certain "menopausal hormone therapy products" that Defendant Wyeth designed, manufactured, and marketed.[1]  (Am. Compl.[2] ¶ 13.)  These hormone therapy products have been "marketed to women who are going through menopause," which is a "time in the natural aging process of a woman when her body's production of the natural hormones estrogen and progesterone is dramatically reduced."  (*Id.* ¶ 11.)

In 1942, Wyeth "received approval for Premarin, which is a conjugated equine estrogen [("CEE")] made from the urine of pregnant mares."  (*Id.* ¶ 12.)  Defendant marketed Premarin as a "replace[ment for] the natural female hormone estrogen."  (*Id.*)  By the mid-1970s, "more than 30 million prescriptions for Premarin were being written every year."  (*Id.* ¶ 20.)  Sales of Premarin, however, soon "plummeted" after two articles in the *New England Journal of Medicine* "linked estrogen therapy to a significantly increased risk of women developing endometrial cancer."  (*Id.* ¶ 21.)

In 1979, an article in the *Journal of the American Geriatrics Society* reported that "'estrogen related uterine cancer can be avoided if progesterone is added to the regimen.'"  (*Id.* ¶ 22.)  Defendant and others "immediately started promoting" hormone therapy that combined estrogen ("E") and progesterone ("P").  (*Id.* ¶ 23.)  In that regard, Defendant "developed a synthetic hormone product called Medroxyprogesterone Acetate [("MPA")] that was marketed

---

[1]For purposes of clarity, the Court refers to Defendant Wyeth and any of its corporate predecessors or successors collectively as either "Defendant" or "Wyeth."

[2]Citations to "Am. Compl." refer to Plaintiff's First Amended Personal Injury Complaint, filed in the Circuit Court of Cook County, Illinois May 27, 2004.  (R. 1 at 15-74.)

under the brand name Provera." (*Id.*) From the mid-1980s until 1995, "a common combination prescription was the use of Premarin with Provera." (*Id.*)

In 1994, Defendant received approval for Prempro, which is "combination hormone therapy in a single pill." (*Id.* ¶ 31.) Specifically, Prempro is an oral medication that "combines the estrogenic compound CEE with the progestin MPA in a single pull taken one time per day." (*Id.*) Because Prempro combines estrogen ("E") with progestin ("P"), many refer to the medication as "E+P." Defendant continues to sell Prempro today. (R. 118 at 9 & Ex. 26.)

## II.     Plaintiff's Use of Menopausal Hormone Therapy Products

Plaintiff Jo Belle Baldonado is a 65 year old woman. She took Provera from approximately January of 1995 until May of 1996. In May of 1996, Plaintiff switched to Prempro to help alleviate menopausal symptoms, including hot flashes, night sweats, trouble sleeping, and vaginal dryness. Plaintiff's prescribing physicians were Dr. Terestia Avila and Dr. Mani Akkineni. In or about September of 1998, Plaintiff was diagnosed with breast cancer and she stopped taking Prempro at the direction of Dr. Avila. According to Plaintiff, her use of E+P promoted the development and growth of certain pre-existing cancerous abnormalities in her breast.

## III.    Procedural History

On May 27, 2003, Plaintiff commenced this action against Defendant and others in the Circuit Court of Cook County, Illinois, alleging that Defendant's hormone therapy products caused Plaintiff to develop breast cancer. In her Amended Complaint, Plaintiff asserts claims that include negligence, strict products liability, failure to warn, breach of express warranty, negligent misrepresentation, fraud, and gross negligence. (Am. Compl. at 15-57.) Defendant

3

removed the action to this Court on June 28, 2004 on the basis of diversity of citizenship.  *See* 28

U.S.C. §§ 1332, 1441, 1446.  (R. 1 at 1-7, Not. of Removal.)  Thereafter, on July 27, 2004,

Defendant filed an Answer to the Amended Complaint, denying that Defendant's products

caused Plaintiff's breast cancer and contending that the products were appropriately tested,

labeled, and marketed.  (R. 9, Answer.)

On September 8, 2004, the Judicial Panel for Multidistrict Litigation (the "MDL Panel")

conditionally transferred this action to the U.S. District Court for the Eastern District of

Arkansas (the "MDL Court"), pursuant to 28 U.S.C. § 1407, for coordinated or consolidated

pretrial proceedings with over two hundred similar hormone therapy actions.  (R. 13, Conditional

Transfer Order, at 1 (citing *In re Prempro Prods. Liab. Litig*., 254 F. Supp. 2d 1366 (J.P.M.L.

2003) (designating transferee court for individual, class action, and other federal cases arising

out of the sale or use of prescription hormone therapy medications)).)  Following more than

seven years of litigation in the MDL Court, the MDL Panel remanded the action to this District

on January 26, 2011, pursuant to 28 U.S.C. § 1407.  The case was reassigned to this Court on

January 25, 2012.  A jury trial is scheduled to begin on October 9, 2012.

## IV.    Dr. Randall Patten, M.D.

In advance of trial, Defendant moves to exclude the anticipated expert testimony of Dr.

Randall Patten, M.D., a diagnostic radiologist who the American Board of Radiology has

certified since 1983.  (R. 113, Ex. 1, Expert Report of Dr. Randall Patten, M.D. ("Report"), at 1.)

Following his fellowship, Dr. Patten taught radiology at the University of Washington and the

University of Colorado, in addition to serving on the medical staff of numerous hospitals.  (*Id.*)

Dr. Patten is currently "an employee of Tacoma Radiology Associates and Medical Director of

TRA Medical Imaging Center-on Lilly." (*Id.*) His responsibilities are "primarily clinical, performing and interpreting outpatient imaging studies." (*Id.*) According to Dr. Patten: "I currently review and interpret both screening and diagnostic mammograms, interpreting approximately 4,000 to 5,000 mammograms per year." (*Id.* at 1-2.)

Plaintiff has designated Dr. Patten as an expert on "mammography; breast cancer causation; density changes and E+P's impact on density changes." (R. 168, Ex. 25.) Dr. Patten measured Plaintiff's breast density from twenty different mammographic images of Plaintiff, taken between September 27, 1989 and November 1, 2010. If permitted to testify, as explained below, Dr. Patten would opine that his measurements suggest that Plaintiff's use of Prempro caused her breast density to increase, thereby increasing her relative risk of breast cancer.

In his expert report, Dr. Patten explains that the American College of Radiology has developed a Breast Imaging Reporting and Data System ("BI-RADS") to "describe the density of the breast . . . ." (Report at 8.) The system, he further explains, categorizes breast density across four quartiles:

1. Almost entirely fat: < 25% of the breast volume dense
2. Scattered fibroglandular densities: 25-50% dense
3. Heterogeneously dense: 50-75% dense
4. Extremely dense: > 75% dense

(*Id.*) Dr. Patten references the BI-RADS categories in his report, but he additionally assigns a specific breast density percentage to each of Plaintiff's mammographic images, as follows:

| DATE | DENSITY | CHANGE | DATE | DENSITY | CHANGE |
|---|---|---|---|---|---|
| 09/27/1989 | 65 % | -- | 8/6/2001 | 40% | (5%) |
| 3/14/1991 | 60% | (5%) | 8/22/2002 | 35% | (5%) |
| 9/27/1994 | 60% | 0% | 8/26/2003 | 35% | 0% |
| 12/23/1996 | 65% | 5% | 9/29/2004 | 30% | (5%) |
| 12/22/1997 | 65% | 0% | 9/30/2005 | 30% | 0% |
| 9/15/1998 | 65% | 0% | 10/26/2006 | 30% | 0% |
| 8/24/1999 | 60% | (5%) | 10/29/2007 | 30% | 0% |
| 9/8/1999 | 60% | 0% | 10/30/2008 | 30% | 0% |
| 2/14/2000 | 45% | (15%) | 11/3/2009 | 30% | 0% |
| 8/21/2000 | 45% | 0% | 11/1/2010 | 30% | 0% |

(*Id.* at 3-5.)  Based on his measurements, Dr. Patten opines, in relevant part, that:

> Although Ms. Baldonado's breast density would be expected to decrease during menopause, her mammographic breast density remained heterogeneously dense during the time that she was taking Prempro.  In fact, on mammograms from 1996 to 1998, when she was taking Prempro, Ms. Baldonado's breast density appears to have increased slightly from perimenopausal levels.  An increase in breast density in a post-menopausal woman not on [hormone replacement therapy] is uncommon and suggests that the breast tissue reacted to and was influenced by the presence of exogenous hormones.  The natural fatty involution of density and subsequent decrease in the risk of breast cancer intrinsic to menopause apparently was halted by the use of exogenous hormone therapy.  As discussed, breast density is a risk factor for breast cancer.  Had she not taken hormone replacement therapy, it is likely that her breast tissue would have undergone gradual and natural fatty involution during menopause, thereby reducing her risk of breast cancer.

(*Id.* at 11-12.)

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)."  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).  "The district court functions as a gatekeeper with respect to testimony proffered under

Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission."
*Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v.
Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)); *see also Bielskis v.
Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) ("It is the district courts' role to ensure
that expert testimony is both relevant and reliable.").  Whether to admit expert testimony rests
within the discretion of the district court.  *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118
S. Ct. 512, 139 L. Ed. 2d 508 (1997).  Indeed, a district court has "wide latitude in performing its
gatekeeping function and determining both how to measure the reliability of expert testimony
and whether the testimony itself is reliable." *Bielskis*, 663 F.3d at 894.

        Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill,
experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the
expert's scientific, technical, or other specialized knowledge will help the trier of fact to
understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient
facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the
expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid.
702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011).  The inquiry under
Rule 702 is "flexible." *Bielskis*, 663 F.3d at 894.

        District courts employ a three-part analysis before admitting expert testimony:  (1) the
expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2)
the expert's reasoning or methodology underlying his testimony must be scientifically reliable;
and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to
determine a factual issue.  *See Myers v. Illinois Central R.R. Co.*, 629 F.3d 639, 644 (7th Cir.

2010). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

## DISCUSSION

In the present motion, Defendant challenges the admissibility of Dr. Patten's expert testimony on two grounds. First, Defendant argues that Dr. Patten is not qualified to offer expert testimony on breast cancer and breast density causation. Second, Defendant argues that the methodology underling Dr. Patten's radiological opinions is unreliable. The Court addresses each argument in turn.

## I. Qualification as an Expert on Causation

Defendant first argues that Dr. Patten is not qualified under Rule 702(a) to offer expert opinion "on issues related to breast cancer causation," including "the impact of hormone therapy [("HT")] on Plaintiff's breast density or her risk of breast cancer." (R. 113, Def.'s Mem. at 6.) Plaintiff responds that Defendant's challenge is "moot" because Plaintiff "does not intend to seek general causation testimony from Dr. Patten in this case." (R. 143. Pl.'s Resp. at 2.) Plaintiff's response, however, misses the mark: Defendant argues that Dr. Patten is not qualified to offer expert opinion on general *and/or specific* causation. Thus, Plaintiff has failed to meet her burden to demonstrate that Dr. Patten is qualified to offer expert opinion on specific causation. *See* Fed. R. Evid. 702(a); *Lewis*, 561 F.3d at 705 ("The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard."); *Schrott v. Bristol-Myers Squibb Co.*, No. 03-CV-1522, 2003 WL 22425009, at *1 (N.D. Ill. Oct. 23, 2003) (excluding medical expert, where proponent failed to offer sufficient evidence of the

expert's qualifications in response to an attack on the expert's qualifications).

Further, nothing in the record suggests that Dr. Patten, a radiologist, has the requisite "knowledge, skill, experience, training, or education" to offer exert opinions on specific causation. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("[S]imply because a doctor has a medical degree does not make him qualified to opine on all medical subjects."). *Accord Romero v. Wyeth*, No. 03-CV-1367 (E.D. Tex. Apr. 12, 2012) (concluding that Dr. Patten is not qualified to offer expert opinion on causation, and stating that "Dr. Patten's mere status as a physician and radiologist does not necessarily qualify him to proffer a breast density causation opinion"); *Torkie-Tork v. Wyeth*, No. 04-CV-945 (E.D. Va. July 13, 2010), Mot. Hr'g Tr. at 101-03 (stating that Dr. Patten is "himself not competent" to offer general expert causation testimony).

Perhaps most notably, although he opines that Plaintiff's use of Prempro increased her risk of breast cancer, Dr. Patten admits that he is "not sure exactly what the makeup of Prempro is." (Patten Dep.[3] at 18-24.) Consistent with his lack of familiarity with Prempro, Dr. Patten has repeatedly admitted, in this case and others, that he is not qualified to offer expert opinions on causation in hormone therapy cases. For example, in a similar hormone therapy case, *Esposito v. Wyeth*, Dr. Patten admitted at his deposition:

| DEFENSE COUNSEL: | And you're not qualified to give an opinion on the cause of a breast cancer, is that fair? |
|---|---|
| DR. PATTEN: | That would be better left to a cell biologist or an oncologist, not me. |

---

[3]Citations to "Patten Dep." refer to the transcript of the deposition in this case of Dr. Patten, which took place on August 17, 2011.

(R. 113, Ex. 8, Patten Dep. in *Esposito v. Wyeth* (Nov. 21, 2009), at 201.)

Dr. Patten offered similar deposition testimony in this case. When questioned about his

opinions on causation, Dr. Patten prefaced his testimony with the following:

> Again, I'm not an epidemiologist, . . . so that would be sort of beyond my field. I
> can read the studies. Why they believe that to be true, you know, would really
> need to be explained by an epidemiologist.

(Patten Dep. at 30.) Additionally, at one point, he responded to a question about his

interpretation of medical literature on causation with this caveat:

> Well, it may mean – and, again, I'm not an oncologist or an epidemiologist . . . .

(*Id.* at 80.) In another instance, Dr. Patten stated bluntly:

> You know, I'm not an epidemiologist. I'm a radiologist. I don't deal with
> relative risk.

(*Id.* at 42.)

Although Dr. Patten has reviewed thousands of mammograms during his career, he

admitted that there is nothing distinguishing about the size, shape, or location of breast cancer on

a mammogram that would allow him, as a radiologist, to determine whether a woman was using

HT and/or whether any HT use contributed to changes in breast density or cancer growth. (R.

113, Ex. 9, Patten Dep. in *Torkie-Tork v. Wyeth* (July 13, 2010), at 60-61.)

Precluding Dr. Patten from offering expert opinion on causation is in accord with one of

the only other courts to have considered the same issue. In a passage that applies with equal

force to this case, another federal district court recently concluded that Dr. Patten is not qualified

to offer expert causation opinion in a hormone therapy case against Wyeth, reasoning that:

> Neither Dr. Patten's expert report nor his curriculum vitae demonstrate that Dr.
> Patten renders breast density causation opinions within the scope of his duties as a
> radiologist. The documents merely show that he reviews mammograms and

determines the applicable breast density category. If, during these duties, Dr.
Patten also assesses the causes of his findings, [the plaintiff] has not provided the
Court with any support for this conclusion. Likewise, [the plaintiff] has not
shown that Dr. Patten is qualified to draw meaningful conclusions from the
published research purportedly supporting his causation opinions. Dr. Patten has
published several works and made several scientific presentations, but none of
these activities appear to be related to breast density causation – and very few are
related to mammography. In sum, there is simply no support for [the plaintiff's]
statement that Dr. Patten is qualified to proffer breast density causation opinions.

*Romero v. Wyeth*, No. 03-CV-1367 (E.D. Tex. Apr. 12, 2012).

Accordingly, the Court grants Defendant's motion to exclude any testimony by Dr.

Patten as to issues of breast cancer causation, including the relationship, if any, between HT and

breast density. *See* Fed. R. Evid. 702(a).

## II.     Reliability of Breast Density Measurements

Defendant next seeks to exclude "Dr. Patten's opinions regarding increases and decreases

in Plaintiff's breast density because his methodology for measuring breast density is

scientifically unreliable."[4]  (R. 113, Def.'s Mem. at 9-10.)  As explained above, Dr. Patten relies

in part on specific breast density measurements and changes in density of as little as 5% to

support his opinion that Plaintiff's breast density increased while she was taking Prempro,

thereby placing her at an increased risk of breast cancer.  Defendant contends, among other

things, that Dr. Patten's measurement of breast density in specific percentages, and in increments

of as low as 5%, is a "novel methodology" that neither Dr. Patten nor any other radiologist uses

in private practice.  Because Dr. Patten grounds his opinion in part on unreliable measurements,

---

[4]According to Dr. Patten, breast density in this context refers to "radiologically dense
breast tissue and reflects the tissue composition of the breast. Mammographic density is
described as a percentage of 'whiteness' relative to 'blackness'" on the mammographic image.
(Report at 7.)

Defendant asks the Court to exclude his expert testimony. (R. 169, Def.'s Rep. at 5.)

Plaintiff does not defend or address Dr. Patten's methodology in her response.[5] Having reviewed the record, the Court agrees with Defendant that Dr. Patten's methodology falls short of the standard of scientific reliability that the Supreme Court articulated in *Daubert*. *See Bielskis*, 663 F.3d at 894 ("we give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable").

To begin, as Dr. Patten acknowledges, his measurement of breast density with specific percentages, and in gradations as small as 5% in density, is at odds with the BI-RADS system of quartile measurements developed by the American College of Radiology. (*See* Report at 7-8 (acknowledging that the BI-RADS categories measure density in 25% increments); R. 113, Ex. 3, Patten Dep. in *Zahn v. Wyeth* (Feb. 5, 2011), at 44-48 ("[T]he American College of Radiology standards for breast density . . . is in a quartile system.").) His methodology also represents a significant departure from the methodology employed by most every radiologist in private practice, including Dr. Patten himself. *See Kumho Tire Co.*, 526 U.S. at 152 (holding that an expert must "[e]mploy in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Daubert*, 509 U.S. at 594 ("[A] known technique which has been able to attract only minimal support within the community, may properly be viewed with skepticism") (internal citation omitted).

---

[5]Plaintiff responds by offering an abstract discussion of existing medical knowledge and a summary of Dr. Patten's conclusions, without ever addressing the reliability of Dr. Patten's methodology. (*See* R. 143, Pl.'s Resp. at 7-10 (arguing in conclusory fashion that "[t]here is simply no truth to [D]efendants' [sic] assertion that Dr. Patten lacks any support for his opinion").)

Indeed, Dr. Patten admits that (1) many if not most radiologists, including all of the radiologists in his community and medical practice, use the BI-RADS system; (2) he is not aware of any other radiologist in his medical practice or otherwise who measures breast density with a specific percentage, or who observes changes in breast density of as little as 5-10%, rather than a range of at least 25%; and (3) other than his work as an expert in litigation, he has never in private practice reported changes in breast density in 5% increments. In Dr. Patten's own words:

- "I've seen radiologists who comment about a decrease or an increase in breast density, but I've not seen necessarily a – someone say specifically there's a 5 percent or a 10 percent increase." (*See* R. 113, Ex. 3, Patten Dep. in *Zahn v. Wyeth* (Feb. 5, 2011) at 47.)

- "[F]rom a clinical standpoint, I'm not aware of people using – breaking down that quartile system into finer gradations." (*Id.* at 46.)

- "I've reported either increases or decreases in density, but I haven't specifically related it to a five percent increase or decrease." (*Id.*, Ex. 5, Patten Dep. in *Sauls v. Wyeth* (Oct. 10, 2011), at 33.)

- "I've never seen a report from [any of the 50 radiologists in my practice] that actually assigned a specific percentile." (*Id.*, Ex. 15, Patten Dep. in *Chandler v. Greenstone Ltd.* (May 19, 2011), at 35.)

- "I've never seen a specific number [in a report from any medical practice]." (*Id.*)

It is therefore not surprising that the record is devoid of any evidence that Dr. Patten's methodology has been tested or subjected to peer review. *See Daubert*, 509 U.S. at 593-94 ("[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected."). To the contrary, Dr. Patten has admitted that he "ha[s]n't done any specific evaluation" of the reliability of measuring breast density in percentages smaller than quartiles, other than "sort of

13

looking at some literature" that neither he nor Plaintiff have identified.  (R. 113, Ex. 15, Patten

Dep. in *Chandler v. Greenstone Ltd.* (May 19, 2011), at 33.)  Dr. Patten has further admitted that

he has not studied or researched the scientific reasoning behind the American College of

Radiologists' reliance on "quartile[s] versus smaller increments."  (*Id.*)  The potential error rate

of Dr. Patten's methodology is thus unknown.  (R. 113, Def.'s Mem. at 6 n.13 (citing Ex. 8,

Patten Dep. in *Esposito*, at 24-25 ("Q.  I just want to make sure, you think that from one film to

another film, you can estimate accurately the difference in 70 and 75 percent or the difference in

65 percent and 70 percent density?  A.  How accurate you are, you know, I don't know.  I

haven't done any studies on that.  I believe you can be pretty close."))).)

Under these circumstances, the Court cannot say that Dr. Patten's specific breast density

measurements, most of which reflect a change in increments of 5%, are "well-grounded in

methods and procedures of science."  *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir.

2002) (citing, inter alia, *O'Connor v. Commonw. Edison Co.*, 13 F.3d 1090, 1107 (7th Cir. 1994)

(holding that a physician who relied only on personal observation without any personal study or

experiment to justify his conclusions did not meet the *Daubert* standard)).  His expert opinion

relies on the sort of untested, highly subjective and novel "courtroom science" that *Daubert*

disallows.  *See Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).  "The goal of

*Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom

testimony as would be employed by an expert in the relevant field."  *Jenkins*, 487 F.3d at 489.

## CONCLUSION

For the reasons explained above, the Court grants Defendant's motion.[6]


DATED:  May 7, 2012


ENTERED

_____

**AMY J. ST EVE**
**United States District Court Judge**

---

[6]Although Plaintiff has not requested a *Daubert* hearing, a *Daubert* hearing is not necessary for purposes of this motion.  Whether to conduct such a hearing is a matter of discretion, and as the Seventh Circuit has held, a district court need not conduct a *Daubert* hearing where the court has "a sufficient basis for [the] decision without holding a hearing." *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998).  Here, the record is well-developed as to Dr. Patten, and includes the full transcript of Dr. Patten's deposition in this case, as well as extensive testimony from him in other similar hormone replacement therapy cases.  The Court need not take any additional evidence because the record provides more than a "sufficient basis" to evaluate Defendant's challenges to the admissibility of Dr. Patten's anticipated expert testimony.  *See Kirstein*, 159 F.3d at 1067.