IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JO BELLE BALDONADO, | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 4312 |
| WYETH *and its division,* | ) | |
| WYETH PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Wyeth moves *in limine* to exclude the anticipated expert testimony of two of Plaintiff's designated marketing experts – Dr. Matthew F. Hollon and Dr. Adriane J. Fugh-Berman. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). As explained below, Defendant's motion is granted in part, and denied in part.

### BACKGROUND

Plaintiff Jo Belle Baldonado was diagnosed with breast cancer while she was taking Prempro, a prescription hormone therapy ("HT") medication that Defendant Wyeth designed, manufactured, and marketed. Plaintiff's prescribing physicians were Dr. Teresita D. Avila, M.D. and Dr. Mani Akkineni, M.D. Alleging that Prempro caused her breast cancer, Plaintiff filed the present civil action against Defendant and others. Trial is scheduled for October 9, 2012.

In advance of trial, Defendant moves to exclude the testimony of Dr. Matthew Hollon and Dr. Adriane Fugh-Berman, both of whom Plaintiff has designated as experts on Wyeth's

marketing practices for its hormone therapy medications. The witnesses are "general liability experts" who have not filed case-specific expert reports. (R. 131, Pl's Resp. at 1.)

**I.      Expert Qualifications**

Defendant does not challenge the qualifications of either Dr. Hollon or Dr. Fugh-Berman to offer expert opinions on Defendant's marketing practices. *See* Fed. R. Evid. 702(a) (stating that an expert may by qualified by "knowledge, skill, experience, training, or education"). For purposes of context, however, the Court briefly summarizes each expert's professional background.

**A.      Dr. Matthew F. Hollon, M.D., MPH**

Dr. Hollon is a Board-certified physician of Internal Medicine at the University of Washington in Seattle ("UW"). (R. 131, Ex. 13, Expert Report of Dr. Hollon ("Hollon Report"), at 1.) He graduated from the UW School of Medicine in 1994, and thereafter completed a medical residency and fellowship in Internal Medicine at UW. (*Id.*) During his fellowship, Dr. Hollon attended classes at the UW School of Public Health and Community Medicine and received a Masters of Public Health. (*Id.*) Currently, Dr. Hollon is the Director of Evidence-Based Medicine for the Internal Medicine Residency Program at the UW Department of Medicine and an Assistant Professor in the Division of General Internal Medicine. (*Id.*) Dr. Hollon has been an active member in numerous professional organizations, and has published extensively in the area of pharmaceutical marketing. (*Id.* at 1-2.) He has also consulted on this topic for the Canadian government. (*Id.*)

**B.      Dr. Adriane J. Fugh-Berman, M.D.**

Dr. Fugh-Berman is an associate professor in the Department of Physiology and Biophysics at Georgetown University Medical Center, where she teaches "graduate courses in

the history of medicine and critical assessment of medical literature, including a module on clinical trial methodology and assessment of adverse events." (R. 131, Ex. 15, Expert Report of Dr. Fugh-Berman ("Fugh-Berman Report"), at 1.) She also lectures about "pharmaceutical company influence on physician prescribing practices." (*Id.*) For more than twenty-five years, Dr. Fugh-Berman has "worked in the field of women's health and corporate influence on healthcare," and has published numerous articles in that regard, including articles "on the culture of gynecology and the effect of drug company promotion on prescribing habits." (*Id.*) Dr. Fugh-Berman previously practiced general medicine with a focus on women's health. (*Id.*) After leaving clinical practice in 2001, Dr. Fugh-Berman has, among other professional pursuits, "been a consultant, scientific reviewer, working group member, or speaker on women's health issues for the National Institutes of Health, the Federal Trade Commission, the Centers for Disease Control, the Agency for Health Care Research and Quality, the Department of Defense, the National Security Agency, and the Institute of Medicine." (*Id.* at 1-2.)

## II.   Anticipated Expert Testimony

Plaintiff seeks to call either Dr. Hollon or Dr. Fugh-Berman as a general liability expert on Defendant's marketing practices.[1] If permitted to testify, according to Plaintiff, the experts would opine that Defendant's marketing of HT products including Prempro fell below the standard of care that a pharmaceutical company should exercise. (R. 131, Pl.'s Resp. at 5-6, 8.) The experts in their respective reports offer extensive detail about Defendant's marketing practices and opine on the impact of those practices on patients and physicians. (*Id.*)

Plaintiff offers the experts to establish "key elements in Plaintiff's negligence and

---

[1]Plaintiff represents that the experts would offer materially identical testimony, and that she designated both to ensure the availability of at least one of the experts for trial.

punitive damages claims." (R. 131, Pl.'s Resp. at 3.) Plaintiff contends that the experts "will serve to educate the jury on the nature and purpose of the marketing materials seen by Mrs. Baldonado and her physicians" (*id.* at 8), thereby "provid[ing] context for Wyeth's breach of its duty to the physicians and patients . . . ." (*Id.* at 3.)

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)); *see also Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) ("It is the district courts' role to ensure that expert testimony is both relevant and reliable."). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). Indeed, a district court has "wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis*, 663 F.3d at 894.

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011). The inquiry under Rule 702 is "flexible." *Bielskis*, 663 F.3d at 894.

District courts employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *See Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

## ANALYSIS

In the present motion, Defendant seeks to exclude the expert testimony of Dr. Hollon and Dr. Fugh-Berman on the ground that such testimony is irrelevant and unreliable. To the extent the Court permits the experts to testify, Defendant alternatively seeks to preclude the experts from offering "narrative histories" of hormone therapy marketing practices; opinions on Defendant's intent and/or motives; and opinions on the applicable standard of care. The Court addresses each of these issues below.

### I. Relevance

The Court first considers the threshold issue of relevance. Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the

action." Fed. R. Evid. 401; *see also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."); *Daubert*, 509 U.S. at 590-91 (observing that expert testimony must be relevant in order to "assist the trier of fact" under Rule 702).

In its motion, Defendant argues that neither Plaintiff nor her physicians relied on any of Defendant's marketing materials, and therefore evidence of Defendant's marketing materials and practices can have no bearing on Plaintiff's injuries, nor properly provide evidence relevant to the assessment of a punitive damages award.[2] (R. 116, Def.'s Mem. at 4-6.) Plaintiff responds that both she and her prescribing physicians relied on Defendant's marketing materials, and her experts "will limit their testimony in this trial to the marketing conduct of Wyeth that is relevant to this plaintiff's case." (*Id.* at 1; *see also id.* at 9 ("[T]hese doctors' testimony will be specifically tailored to the facts of this case.").)

The parties agree, at least implicitly, that the expert testimony is relevant to the extent that Plaintiff and/or her prescribing physicians relied on the marketing materials about which the experts would opine. (*See* R. 116, Def.'s Mem. at 6; R. 131, Pl.'s Resp. at 13, 17); *accord De Bouse v. Bayer AG*, 235 Ill.2d 544, 337 Ill. Dec. 186, 922 N.E.2d 309 (2009) ("If a consumer has

---

[2]On the subject of negligence, see generally *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 871 (7th Cir. 2010) ("'proof of negligence in the air . . . will not do'") (quoting *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99, 99 (1928)) and *Pipp v. Johnson and Johnson*, No. 09-CV-5944, 2010 WL 2365303, at *1 (N.D. Ill. June 9, 2010) (citing *Smith v. Eli Lilly & Co.*, 137 Ill.2d 222, 233, 137 Ill.2d 222, 560 N.E.2d 32, 560 N.E.2d 324 (1990) ("In a negligence action th[e] causation-in-fact requirement entails a reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.")). On the subject of punitive damages, see generally *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 931 (7th Cir. 2004) (stating, in the context of punitive damages, "'[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business'") (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003)).

neither seen nor heard [the marketing] statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause."). Reliance is a question of fact, and under the Federal Rules of Evidence, "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b).

Here, although the pre-trial record contains some evidence of reliance on marketing materials,[3] a ruling on the relevance of the proffered testimony to the negligence or punitive damages claims is premature. Plaintiff has agreed to "specifically tailor[]" the expert testimony "to the facts of this case." (R. 131, Pl.'s Resp. at 9); *see also Barton v. Wyeth Pharm., Inc.,* No. 694/695 EDA 2012, 2012 WL 112613 (Pa. Super. Ct. Jan. 3, 2012) (applying Illinois law)

---

[3] Defendant argues that Drs. Avila and Akkineni did not rely on Defendant's marketing practices, reasoning that the doctors testified as much. (*See* R. 116, Def.'s Mem. at 3-4 (citing, e.g., Dr. Avila Dep. (7/20/11) at 21, 256-57; Dr. Akkineni Dep. at 115-16).) Defendant presents this testimony out of context. Although the doctors may have stated that they did not rely on marketing materials, the doctors gave that testimony in the context of explaining that the decision to prescribe Prempro to Plaintiff was an exercise of independent medical judgment. This context is significant because throughout their depositions, the doctors explained that marketing activities and information from drug companies underlie and inform, at least in part, the exercise of their medical judgment. (*See, e.g.*, Dr. Avila Dep. (8/10/11) at 210 (testifying that information from a "sales rep" would go into the decision-making process); Dr. Akkineni Dep. at 15 (decisions based in part on marketing information received from drug manufacturer), 117-18 (advised patients of risk based on review of the literature).) The doctors testified about many of these influences. (*See, e.g.* Dr. Avila Dep. (7/20/11) at 15 ("whatever is out and recommendations and medical literature that is given to us"), 16 (letters from drug companies), 16-17 (textbooks), 18 (Physicians Desk Reference ("PDR")), 19-20 (lectures), 22 (journals), 24 (booklets), 27 (advertisements), 27 (materials brought in by patients), 50 (office visit by sales representatives); Dr. Avila Dep. (8/10/11) at 210 (pamphlets); Dr. Akkineni Dep. at 15 (visits by sales representatives who provide product information), 17 (text books and educational information from medical associations), 20 (PDR), 24 (studies), 49 (specific document from Wyeth sales team), 54 ("Dear Doctor" letters), 58 (office visits by sakes representatives), 61 (continuing medical education); *accord* R. 132, Ex. 22 (medical records: "reading material on estrogen replacement [] given to the patient").)

(finding no abuse of discretion in the trial court's admission of evidence of Wyeth's "extensive marketing activities," where a physician's information on the drug at issue was "rooted, at least indirectly, in Wyeth's active promotion of its product"). If Plaintiff seeks to offer expert testimony on Defendant's marketing practices, Plaintiff must *first* introduce evidence that is "sufficient to support a finding" that the testimony relates to the underlying facts of this case. *See* Fed. R. Evid. 104(b) & adv. comm. notes ("The order of proof here, as generally, is subject to the control of the judge."); *see also United States v. Boling*, 648 F.3d 474, 482 (7th Cir. 2011) ("A trial judge has discretion to control the mode and order of witness interrogation and evidence presentation.") (citing Fed. R. Evid. 611(a)).

Additionally, given the breadth of the expert reports at issue, the Court orders as follows:

- By May 31, 2012, Plaintiff shall file a detailed statement of the specific expert testimony and opinions that she intends to elicit at trial *in this case* from Dr. Hollon and/or Dr. Fugh-Berman. The statement must include supporting references to the expert reports and depositions.

- The parties shall meet and confer in good faith on the relevance of the proposed testimony on or before June 8, 2012.

- If the parties are unable to reach agreement, Defendant shall file objections to the relevance of the proposed testimony by June 12, 2012. Plaintiff may reply, if at all, by June 15, 2012.

## II.     Narrative Histories

Defendant next seeks to preclude the experts from offering "narrative histories" of Defendant's promotion of hormone therapy. (R. 116, Def.'s Mem. at 7.) In their respective reports, Dr. Hollon and Dr. Fugh-Berman offer lengthy narrative summaries about Defendant's promotion of hormone therapy products over approximately the last 60 years. (*See* Hollon Report at 8-88; Fugh-Berman Report at 5-31.) Defendant argues that this type of narrative

testimony, based on the experts' review of documents, does "not involve any application of 'scientific, technical or other specialized knowledge'" and "will not aid the jury and will impermissibly interfere with its role as trier of fact." (Def.'s Mem. at 14 (quoting Fed. R. Evid. 702).) The Court agrees.

Under the circumstances of this case, allowing an expert to provide summary testimony "based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself." *United States v. Vance*, No. 07-CR-351, 2011 WL 2633842, at *5 (N.D. Ill. July 5, 2011) (citing *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403.")). Even if the expert may have relied upon his or her expertise to "wade through the multitude of possibly relevant documents," the "vast majority" of the experts' proffered narratives amount to a summary and statement of the experts' "advocacy-based interpretation of documents in the record concerning" HT marketing practices. *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 967 (D. Minn. 2009); *see also In re Trasylol Prods. Liab. Litig*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010) (finding that expert's testimony "will not assist trier of fact," where testimony "mostly consists of a factual narrative of [drug's] regulatory history and summaries of [pharmaceutical defendant's] internal documents"); *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 886 (E.D. Ark. 2008) ("If an expert does nothing more than read exhibits, is there really any point in her testifying as an expert?"). For these reasons, the experts may not offer factual narrative testimony that simply summarizes documents relating to Defendant's promotion of hormone

therapy.

## III. Reliability

Defendant contends that the experts' testimony "should [] be excluded because it does not come close to the standard of reliability." (R. 116, Def.'s Mem. at 9.) As explained below, Defendant does not present any argument that warrants exclusion of the proffered expert testimony on the basis of reliability.

### A. Dr. Hollon

Defendant argues that Dr. Hollon failed to undertake an "objective investigation of the facts" (*Id.* at 10), and "failed to gather relevant data." (*Id.* at 12-14.) Defendant presents these challenges as two independent arguments.

#### 1. Objective Investigation of the Facts

Defendant relies on Dr. Hollon's deposition testimony to argue that he "made no objective investigation of the facts." (R. 116, Def.'s Mem. at 10 (citing *id.*, Ex. 20, Hollon Dep. in the MDL Court ("Hollon Dep."), at 67-68 (Mar. 27, 2006)).) According to Defendant, Dr. Hollon's deposition testimony shows that he "bases his opinions on material hand-picked for him by Plaintiff's counsel," and then "'randomly'" delves into this limited material and, finding nothing to disprove his views, offers them as expert opinions." (*Id.* (citing Hollon Dep. at 67-68).) Defendant, however, grossly mischaracterizes Dr. Hollon's deposition testimony by offering only limited testimony ripped from its context.

Contrary to Defendant's representation, Dr. Hollon never testified that he relied exclusively on the documents that Plaintiff's counsel provided to him. In fact, he explicitly testified that "not all of it was provided by counsel." (Hollon Dep. at 77.) Dr. Hollon testified

10

that he additionally relied on his "knowledge" and "expertise" of marketing practices (*id.* at 33), and on materials that he "found . . . independently" (*id.* at 46). He further testified that he gathered a "substantial portion" of the documents he reviewed "well prior to any specific work that I did related to this case." (*Id.* at 36; *see also id.* at 28 ("most of the medical literature that I used to write this report was obtained by my own independent efforts").)

To the extent Dr. Hollon relied on documents that counsel sent to him, the record contradicts Defendant's assertion that these documents were "limited." (*Id.* at 21, 27 ("millions of pages").). As Dr. Hollon testified: "There were boxes upon boxes upon boxes of documents sent, numbering thousands upon thousands upon thousands of pages . . . ." (*Id.* at 21 (further noting that he received an initial and then subsequent set of documents, and also 240 gigabytes of information on a hard drive).) Despite the breadth of counsel's production, Dr. Hollon also requested additional materials, which he received. (*Id.* at 24, 69.)

Furthermore, contrary to Defendant's arguments, Dr. Hollon did not simply look to counsel's documents to disprove his opinions. Once Dr. Hollon reached his tentative opinions, he "went back to look in the medical literature . . . and in the popular literature, using" electronic databases, including LexisNexis, to test his opinions. (*Id.* at 67-68; *see also id.* at 33 (testifying that he relied on his own experience combined with a "comprehensive summary of the available literature on the general impact of promotion on prescribing practices of physicians, and the influence that direct to consumer marketing has on those prescribing practices in this country"); *id.* at 67 ("It's my responsibility, as a researcher and scientist, to try and triangulate and to review as much as I can to form an opinion so that my opinion is valid.").)

For all of these reasons, the Court cannot say that Dr. Hollon failed to undertake an

11

objective investigation of the facts such that his expert testimony lacks reliability. (*Id.* at 33 (testifying that he relied on his own experience combined with a "comprehensive summary of the available literature on the general impact of promotion on prescribing practices of physicians, and the influence that direct to consumer marketing has on those prescribing practices in this country").) Defendant's challenges go to the weight of Dr. Hollon's expert testimony, not its admissibility. *See Walsh v. Chez*, 583 F.3d 990, 995 (7th Cir. 2009) (holding that the "district court erred in concluding that whatever flaws existed in the expert reports . . . went to their admissibility, as opposed to their weight").

### 2. Gather Relevant Data

Defendant next argues that Dr. Hollon "failed to gather relevant data." (R. 116, Def.'s Mem. at 12.) Defendant's somewhat undeveloped argument focuses on certain specific opinions.

First, Defendant argues that, with respect to "Dr. Hollon's opinion that Wyeth repeatedly ignored the FDA's directives regarding HT advertisements":

> [Dr. Hollon] did not obtain all the facts about those ads, including when they ran, where they ran, or even whether they ran at all. He is not familiar with the correspondence file between Wyeth and the FDA, and instead bases his opinion on his 'sense' of what happened.

(*Id.* at 13.) This argument, however, mischaracterizes the portions of the record upon which it relies. (*Id.* (citing Hollon Dep. at 232-33, 270-74, 280-81, 284-87).) In the cited deposition testimony, Dr. Hollon offered limited testimony about certain advertisements that might not even be relevant to this case. (*See* Hollon Dep. at 270-87. *Cf. id.* at 257-60 (testifying that he created a binder of relevant promotional materials).) Dr. Hollon is not a case-specific expert, and nothing in the cited testimony establishes that Dr. Hollon is unfamiliar with Defendant's HT

advertising generally, or otherwise lacks a sufficient factual basis to opine on Defendant's marketing activities. This is particularly true in light of his experience, research, and review of relevant records. Moreover, to the extent Defendant suggests that Dr. Hollon lacks familiarity with "the correspondence file between Wyeth and the FDA," Defendant offers nothing to support such a sweeping statement. Defendant relies exclusively on Dr. Hollon's testimony relating to Defendant's promotion of HT for off-label use – an issue that is irrelevant to this case. (*Id.* at 232-33.)

Second, with regard to Dr. Hollon's opinion that Defendant "exert[ed] profound control over" the medical literature on HT, Defendant argues that the opinion is unreliable because Dr. Hollon "admits that he cannot quantify the extent to which Wyeth allegedly influenced the medical literature." (R. 116, Def.'s Mem. at 13-14.) In support of its argument, Defendant relies on Dr. Hollon's deposition testimony that Defendant's funding of articles "was a piece of the overall marketing plan that influenced providers and patients together . . . . It's reasonable to suppose that they continued to invest in it because it was effective." (*Id.*) When read in the proper context, however, this testimony does not support Defendant's argument. Dr. Hollon's testimony was in the context of discussing the existence of thousands of articles on HT and how Defendant used these articles as "a piece of the overall marketing plan that influenced providers and patients together." (Hollon Dep. at 324; *see also id.* at 152 (discussing the effect of "comprehensive promotional efforts of Wyeth" and "integrated marketing tactics," which took place "through all these different channels").)

Finally, Defendant argues that Dr. Hollon's opinion on ghostwriting "hinges on a single article that he admits he did not read." (R. 116, Def.'s Mem. at 14 (citing Hollon Dep. at 321).)

13


Defendant neither discusses the content or methodological value of this "single article," nor does Defendant discuss the relevant portions of Dr. Hollon's expert report in which he references numerous sources upon which he bases his opinion on ghostwriting. (Hollon Report at 62, 72-73, 77.) Moreover, as to the specific article to which Defendant refers, Dr. Hollon never testified that "he did not read" the article, but instead testified that he only had an abstract of the article with him "here." (Hollon Dep. at 321.)

### 3. Scientific Standards

Defendant next argues that Dr. Hollon failed to adhere to scientific standards. (R. 116, Def.'s Mem. at 13.) Defendant reasons that Dr. Hollon has previously opined in the *Journal of the American Medical Association* ("*JAMA*") that, as a general matter, the net public benefit of direct-to-consumer advertising is unclear. (*Id.* at 15.) By now "offering a contrary [opinion] in this litigation," Defendant asserts that "Dr. Hollon is applying different standards in the courtroom than those applied in his professional practice."[4] (*Id.*) The Court again disagrees. Dr. Hollon's *JAMA* article does not discuss Defendant or HT marketing practices, and therefore is not counter to his opinions in the present litigation. In any event, the existence of this prior

---

[4] Defendant also contends that "in the five years since he was retained as an expert in the HT litigation, he has never subjected his opinions (and accordingly his methodology) regarding Wyeth's advertising to peer review." (R. 116, Def.'s Mem. at 15.) This argument, comprised of one conclusory sentence without elaboration or reference to any legal authority, is waived. *See Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 617 n.1 (7th Cir. 2012) (holding that "perfunctory and undeveloped arguments unsupported by pertinent authority are waived"). Even if Defendant had not waived this argument, the existence of peer review is one of myriad relevant factors under *Daubert*. Defendant makes no attempt to explain how this factor, viewed with others, warrants exclusion under *Daubert*. *See Daubert*, 509 U.S. 593-94 ("The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.").

publication goes to the weight, not the admissibility, of his expert testimony.

### B. Dr. Fugh-Berman

Defendant's sole challenge to Dr. Fugh-Berman's methodology is this: she failed to make an objective investigation of the facts because she "published . . . a paper . . . , which is critical of the 'lawful' practice of 'ghostwriting.'" (R. 116, Def.'s Mem. at 10-11.) Defendant reasons that Dr. Fugh-Berman's publication "reveals that she is simply a mouthpiece for HT plaintiffs' counsel" because she relied heavily on "plaintiffs' counsel" for the content of her article. (*Id.* at 11.) Other than offer a defense of ghostwriting, Defendant does not advance any legal argument in support of excluding Dr. Fugh-Berman's testimony under any applicable legal authority. To the extent Defendant disagrees with Dr. Fugh-Berman's opinions as to ghostwriting, Defendant may, if otherwise appropriate, explore these issues with the witness on cross-examination.

## IV. Intent and Motivation

Defendant seeks to preclude Dr. Hollon from testifying about Defendant's "internal motivations," arguing that such testimony would amount to improper speculation. (R. 116, Def.'s Mem. at 15-16.) Plaintiff responds that "opinions as to Wyeth's ultimate motives and intent are certainly not the main thrust of Dr. Hollon's report or testimony. Where he does touch upon the subject, Dr. Hollon provides objective sources." (R. 131, Pl.'s Mem. at 22.)

The Court agrees with Defendant. Nothing in Plaintiff's brief or the record suggests that Dr. Hollon has personal knowledge of the internal motivation for any of Defendant's actions, and furthermore, the jury is fully capable of considering the issue of intent based on the evidence presented at trial. *See DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("He

could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive."); *Johnson v. Wyeth LLC*, No. 10-C-2690, 2012 WL 1204081, at *3 (D. Ariz. Apr. 11, 2012) (precluding plaintiff's experts from offering "opinions concerning defendants' motive, intent, knowledge, or other state of mind"); *In re Yasmin and YAZ (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.*, 09-md-2100, 2011 WL 6302287, at *12 (S.D. Ill. Dec. 16, 2011); *Loewen v. Wyeth, Inc.*, No. 03-J-2166, 2011 WL 6942870, at *4 n.3 (N.D. Ala. Nov. 14, 2011) (precluding Dr. Hollon from offering any testimony that "constitutes his personal views as to the intent, motive, and state of mind of Wyeth"); *George v. Kraft Foods Global, Inc.*, 800 F. Supp. 2d 928, 932-33 (N.D. Ill. 2011) (excluding expert's state of mind opinion as speculative and unhelpful); *United States Gypsum Co. v. Lafarge N. Am., Inc.*, 670 F. Supp. 2d 768, 775 (N.D. Ill. 2009) (citing *Dahlin v. Evangelical Child and Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002) ("testimony that does little more than tell the jury what result to reach is unhelpful and thus inadmissible, and testimony regarding intent—essentially an inference from other facts—is even more likely to be unhelpful to the trier of fact") (internal citation omitted)); *Nat'l Jockey Club v. Ganassi*, No. 04-3741, 2009 WL 2177217, at *8 (N.D. Ill. July 21, 2009) ("intent of the parties must be determined by the jury, and expert opinion testimony is not necessary on this point").

      Accordingly, the Court grants Defendant's motion to preclude Dr. Hollon from offering opinion testimony as to Defendant's state of mind, including intent or motivation.

V.   **Standard of Care**

Finally, Defendant seeks to preclude Dr. Hollon from offering testimony "regarding the standard of care for pharmaceutical marketing." (R. 116, Def.'s Mem. at 16.) Defendant reasons that Dr. Hollon's opinion on the applicable standard of care amounts to his own subjective "views on marketing ethics" without any objective foundation. (*Id*.) Once again, the Court disagrees. Dr. Hollon is a physician and expert in drug marketing, and he may reliably draw on his vast experience in this area, and his expert knowledge of federal and industry regulations, to opine on the standard of care. (*See* Hollon Report at 23; Hollon Dep. at 219-21, 237-38, 264-65); *accord Loewen*, 2011 WL 6942870, at *1 n. 1 ("the court sees no reason why Dr. Hollon's testimony regarding the standard of care should be excluded" on the basis that it amounts to "personal opinions"); *In re Prempro Prods. Liab. Litig.*, No. 03-CV-1507, 2006 WL 5217764, at *5 (E.D. Ark. Sept. 13, 2006) (rejecting Wyeth's challenge to Dr. Hollon's proposed testimony on the standard of care, reasoning that "[c]learly, Dr. Hollon has a knowledge of pharmaceutical marketing that is beyond a juror's common understanding").

## CONCLUSION

For the reasons explained above, the Court grants in part, and denies in part, Defendant's motion.

**Date:** May 17, 2012

                **ENTERED**

                _____
                **AMY J. ST. EVE**
                **United States District Court Judge**