IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JO BELLE BALDONADO, | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 4312 |
| WYETH *and its division,* | ) | |
| WYETH PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff Jo Belle Baldonado was diagnosed with breast cancer while she was taking Prempro, a prescription hormone therapy medication that Defendant Wyeth designed, manufactured, and marketed.[1] Alleging that Prempro caused her breast cancer, Plaintiff filed the present civil action against Defendant and others. In advance of trial, Defendant moves to exclude the expert testimony of Dr. Elizabeth Z. Naftalis, M.D., Plaintiff's designated specific causation expert. The Court held a *Daubert* hearing on May 10, 2012, during which Dr. Naftalis offered extensive testimony. Based on Dr. Naftalis' testimony, considered together with the parties' briefs and the record, the Court denies Defendant's motion to exclude Dr. Naftalis' expert testimony in its entirety.

---

[1]For purposes of clarity, the Court refers to Wyeth and any of its corporate predecessors or successors collectively as "Defendant."

**INTRODUCTION**

On May 27, 2003, Plaintiff commenced this action against Defendant and others in the Circuit Court of Cook County, Illinois, alleging that Defendant's hormone therapy products caused Plaintiff to develop breast cancer. In her Amended Complaint, Plaintiff asserts claims including negligence, strict products liability, failure to warn, breach of express warranty, negligent misrepresentation, fraud, and gross negligence. (R. 1 at 15-57, Am. Compl.[2]) Defendant removed the action to federal court on June 28, 2004 on the basis of diversity of citizenship. *See* 28 U.S.C. §§ 1332, 1441, 1446. (R. 1 at 1-7, Not. of Removal.) Thereafter, on July 27, 2004, Defendant filed an Answer to the Amended Complaint, denying that Defendant's products caused Plaintiff's breast cancer and contending that the products were appropriately tested, labeled, and marketed. (R. 9, Answer.)

On September 8, 2004, the Judicial Panel for Multidistrict Litigation (the "MDL Panel") conditionally transferred this action to the United States District Court for the Eastern District of Arkansas (the "MDL Court"), pursuant to 28 U.S.C. § 1407, for coordinated and consolidated pretrial proceedings with over two hundred similar hormone therapy actions. (R. 13, Conditional Transfer Order at 1 (citing *In re Prempro Prods. Liab. Litig*., 254 F. Supp. 2d 1366 (J.P.M.L. 2003) (designating transferee court for individual, class action, and other federal cases arising out of the sale or use of prescription hormone therapy medications)).) Following more than seven years of litigation in the MDL Court, the MDL Panel remanded the action to this District on January 26, 2011, pursuant to 28 U.S.C. § 1407. The case was reassigned to this Court on

---

[2]Citations to "Am. Compl." refer to Plaintiff's First Amended Personal Injury Complaint, filed in the Circuit Court of Cook County, Illinois on May 27, 2004. (R. 1 at 15-74.)

January 25, 2012.  A jury trial is scheduled for October 9, 2012.

**BACKGROUND**

I.     **General Background**

     A.     **Female Hormones**

Hormones are "chemicals formed in one part of the body that circulate [] and attach to particular receptors on or within certain other parts of the body."  (R. 146, Ex. 30, Decl. & Expert Report of Dr. Elizabeth Z. Naftalis, M.D. ("Expert Report") at 9.)  By attaching to receptors, hormones deliver "message[s]" and can "alter the structure and or function of the organ."  (*Id.*)  The primary female hormones are Estrogen ("E") and Progesterone ("P").  (*Id.*)  The levels of these hormones fluctuate throughout a woman's life.  (*Id.*)

From puberty through her child-bearing years, a woman is considered to be premenopausal.  (*Id.*)  During this time, a woman's hormones "fluctuate monthly in a regular cycle to prepare the woman's body for the possibility of conception."  (*Id.*)  This cyclical fluctuation begins to change when a woman approaches menopause, usually between the age of 45 and 55.  (*Id.* at 9-10.)  "Menopause is defined typically in the medical literature as a year cessation of periods, when a woman reaches an appropriate age or perhaps has a surgical menopause where the ovaries are removed."  (Transcript of *Daubert* Hearing on Dr. Naftalis ("Hr'g Tr.") at 82.)

The period immediately preceding menopause is called perimenopause.  (*Id.*)  During perimenopause, a woman's ovaries "begin to shut down" (Expert Report at 10), and she may experience any number of symptoms, including irregular cycling, irregular bleeding, surges of hormones, hot flashes, night sweats, urinary incontinence, vaginal dryness, vagina atrophy,

3

mood swings, sleeplessness, and restlessness. (*Id.* at 10-12; Hr'g Tr. at 83, 88, 90.) These symptoms often result from declining hormonal levels, and will range from minor to severe depending on the individual. (Expert Report at 10-12.) Many of the symptoms "will come and go" because the women's ovaries are "sputtering out" and will "have periods where they will be able to produce enough hormones to have a regular menstrual cycle[, and periods where the] woman may not have a cycle for two to three months because her ovaries can't produce the hormones." (Hr'g Tr. at 81-85.) A woman's hormonal levels therefore will fluctuate during perimenopause. (*Id.*)

Although women will experience a decrease in hormonal levels during perimenopause, "the degree of this reduction is highly variable" across the female population. (Expert Report at 10.) Some women become "hormone deficient," a term that refers to "a subset of menopausal women who have such low levels of estrogen and progesterone that they experience symptoms." (*Id.*) Most women, however, will maintain sufficient levels of estrogen "such that they do not experience significant menopausal symptoms." (*Id.* at 12.)

### B.    Breast Cancer

The medical term "cancer" describes "a class of diseases that occurs when cells in a part of the body begin to grow out of control." (*Id.* at 15; *see also* Hr'g Tr. at 9 ("an uncontrolled growth that can spread outside of the tissue of origin to other parts of the body").) Although "normal cells divide and grow in an orderly fashion, . . . cancer cells do not." (Expert Report at 15.) Instead, "[t]hey continue to grow and crowd out normal cells." (*Id.*)

The medical term "breast cancer" refers to a subset of cancers "in which a malignant tumor starts from cells in the breast tissue." (*Id.*) According to Dr. Naftalis:

A woman's breast is made up of glands that make breast milk called lobules. There are ducts, which are the small tubes that carry milk from the lobules to the nipple. There are also fatty and connective tissue, blood vessels, and lymph vessels. Most breast cancers begin in the cells that line the ducts, some begin in the lobules, and a small number start in other tissues.

(Hr'g Tr. at 15.)

Breast cancer is "a multi-step process that begins when the normal and orderly process of cell division and controlled cell death goes wrong." (Expert Report at 16.) Most breast cancers progress through a "series of mutations or changes at the cellular level as the tumor changes from benign to malignant." (*Id.*)

The first step, called "initiation," is the development of the first abnormality in the breast. (*Id.* at 28 ("[I]nitiation refers to the process whereby the carcinogens damage the cell DNA directly, leading to a series of mutations which may eventually result in the development of cancer decades later."); Hr'g Tr. at 20, 23-24, 206.) At this stage, "the cell can appear to look normal, but it can have an abnormality in its DNA." (Hr'g Tr. at 21.) In the majority of cases, doctors do not know "what causes that first abnormality or first [DNA change] in the initial cell" (*id.*), although science has identified numerous risk factors. (Expert Report at 15.)

The second stage, called "promotion," is the addition of "a second stimulus to this abnormal cell[, which causes] the abnormal cell to grow and divide." (Hr'g Tr. at 21-22, 206.) As Dr. Naftalis explained in her expert report:

Promotion refers to a process by which the carcinogen causes an increase in cell division and proliferation so that abnormal and even premalignant cells in the breast grow and divide more rapidly. This rapid cell division leads to an increased opportunity for additional mutations or mistakes in those cells, thereby pushing those abnormalities down the path towards cancer. Once the cells become cancerous, this same proliferative effect will stimulate the cancer to grow larger and continue to evolve and mutate, potentially towards metastatic disease.

(Expert Report at 28-29.)

Doctors typically classify breast cancers across two dimensions: histological type and receptor status. (*Id.* at 16.) Histological type refers to the type of cellular tissue that became cancerous. (Hr'g Tr. at 9-12.) There are three histological types of breast cancer: lobular, ductal, and special, including papillary. (*Id.*)

Receptor status refers to whether the cancer is hormone receptor positive ("hormone-dependent") or hormone receptor negative ("hormone-independent"). (Expert Report at 16.) "If a tumor is hormone receptor positive, that means it needs or needed hormones to grow." (Hr'g Tr. at 12.) Hormone dependent cancers may have estrogen receptors ("ER+") and/or progesterone receptors ("PR+"). (*Id.* at 201-02; Expert Report at 39.) In a hormone-dependent cancer, the hormones will "bind to the [hormone] receptor and cause changes within the cell." (Hr'g Tr. at 17; *see also* Expert Report at 18 ("The progesterone receptor is created when estrogen binds to the estrogen receptor").) This will occur with ER+ cancers regardless of whether the estrogen is endogenous (natural) or exogenous (external). (Hr'g Tr. at 19 ("The receptor can't differentiate between endogenous or exogenous hormones.").) Ascertaining the receptor status of a cancer is important for both prognosis and treatment. (*Id.* at 55.) Doctors typically treat hormone-receptor positive cancers with anti-hormonal therapies. (*Id.*)

For many woman, menopause will act "like a natural barrier to their risk of getting breast cancer" because they will lack sufficient hormones to promote the development of preexisting abnormalities that are "hormonally sensitive." (Expert Report at 20.) As Dr. Naftalis writes, "[i]n women who become hormone deficient as they enter menopause and who do not take combination hormone therapy, any hormone sensitive lesions in the breasts would be expected to

stop growing and even regress as the available hormone source was removed." (*Id.* at 21.)

### C.    Defendant's Menopausal Hormone Therapy Products[3]

For more than fifty years, Defendant has promoted menopausal hormone therapy ("HT")

products to treat the symptoms associated with menopause. (*See* Am. Compl. ¶¶ 12-13; *see also*

Answer ¶¶ 12-13.) Defendant's earliest HT product was Premarin, "a conjugated equine

estrogen [("CEE")] made from the urine of pregnant mares." (*See* Am. Compl. ¶ 12; *see also*

Answer ¶ 12.) According to Plaintiff, after Defendant received approval for Premarin in 1942,

Defendant marketed the drug as a "replace[ment for] the natural female hormone estrogen."

(Am. Compl. ¶ 12.) By the mid-1970s, "more than 30 million prescriptions for Premarin were

being written every year," eventually making it the "fifth most frequently prescribed drug in the

United States." (*Id.* ¶ 20; *see also* Answer ¶ 20 ("many women took estrogen in the 1970s").)

Sales of Premarin, however, soon "plummeted" after two articles in the *New England Journal of*

*Medicine* "linked estrogen therapy to a significantly increased risk of women developing

endometrial cancer." (Am. Compl. ¶ 21.)

In 1979, an article in the *Journal of the American Geriatrics Society* reported that

"'estrogen related uterine cancer can be avoided if progesterone is added to the regimen.'" (*Id.* ¶

22.) Defendant and others "immediately started promoting" hormone therapy that combined

estrogen ("E") and progesterone ("P"). (*Id.* ¶ 23.) In that regard, Defendant "developed a

synthetic hormone product called Medroxyprogesterone Acetate [("MPA")] that was marketed

under the brand name Provera." (*Id.*) Provera "does not have the same chemical or

---

[3]The following information comes from the parties' pleadings, and is summarized for
purposes of background, not as undisputed fact.

pharmacological effect as the natural hormone progesterone." (*Id.*) From the mid-1980s until 1995, "a common combination prescription was the use of Premarin with Provera." (*Id.*) Premarin "became the most frequently dispensed prescription drug in the United States." (*Id.* ¶ 28.)

In 1994, Defendant received approval for "combination hormone therapy in a single pill" that it marketed under the brand name Prempro. (*Id.* ¶ 31; *see also* Answer ¶ 31.) Prempro is an oral medication that "combines the estrogenic compound CEE with the progestin MPA in a single pill taken one time per day." (Am. Compl. ¶ 31; *see also* Answer ¶ 31.) Because Prempro combines estrogen ("E") with progestin ("P"), many refer to the medication as "E+P." (*See, e.g.*, Expert Report at 7.) Defendant continues to sell Prempro today. (R. 118 at 9 & Ex. 26.)

### D. Plaintiff's Medical History and Use of Hormone Therapy

Plaintiff Jo Belle Baldonado, a woman born in 1947, had her first menstrual period at the age of 11. (R. 115, Ex. 2 at 5, 18.) In 1989, Plaintiff had a baseline mammogram that revealed moderately dense breasts, but was otherwise "normal." (Expert Report at 4.) Between 1991 and 1994, Plaintiff began to experience menopausal symptoms including irregular periods and night sweats. (Hr'g Tr. at 82-85.) She also experienced amenorrhea from August of 1993 to January of 1994, a heavy period in January of 1994, and regular periods from January until June of 1994. (*Id.* at 88-89.) Her mammograms during this time remained unchanged. (Expert Report at 4.)

On September 14, 1994, Dr. Mani Akkineni saw Plaintiff as a new patient, and noted that Plaintiff experienced periodic menopausal symptoms, including hot flashes, night sweats, and irregular periods. (*Id.*; Hr'g Tr. at 90-91.) Dr. Akkineni characterized Plaintiff as a "perimenopausal patient" who might consider estrogen replacement therapy. (Hr'g Tr. at 89.)

8

At this time, a blood test showed that Plaintiff had an Estradiol level at 141.  (*Id.* at 177; Expert Report at 5.)

By January 17, 1995, Plaintiff was prescribed and taking Provera to "help her cycles become regular, since she was having irregular cycles and she also had a thickened uterine lining."  (Hr'g Tr. at 93; *see also id.* at 77.)  While on Provera, Plaintiff continued to experience menopausal symptoms and on September 25, 1996, reported to Dr. Teresita Avila that she was "very uncomfortable with hot flashes."  (*Id.* at 92; Expert Report at 5.)  On April 29, 1996, a medical record states that Plaintiff's primary care physician believed that she "needs HRT." (Expert Report at 5; *see also* Hr'g Tr. at 92.)  At that point, Plaintiff had not had a period for the past four months, and she reported that her hot flashes were becoming "terrible."  (Hr'g Tr. at 92.)  Plaintiff continued to take Provera until May of 1996, when Plaintiff switched to Prempro to help alleviate her menopausal symptoms.  (*Id.* at 78, 92-93.)

On September 12, 1996, Dr. Akkineni prescribed Prempro to Plaintiff, observing that Plaintiff "has been doing a lot better since she has been on ERT."  (*Id.* at 94.)  On November 17, 1997, Plaintiff saw Dr. Avila for an annual exam, and Dr. Avila noted that Plaintiff is "still taking her Prempro and is doing fine on it."  (R. 186, Ex. 43 at 14.)  Dr. Avila described Plaintiff as a "normal postmenopausal lady on hormonal replacement therapy."  (*Id.*)

In September of 1998, Plaintiff felt a lump in her right breast.  (R. 115, Ex. 2 at 20.)  On September 15, 1998, Dr. Avila ordered a mammogram and ultrasound, which revealed a 14mm lobular mass in the inferior aspect of the right breast.  (Expert Report at 5.)  On the advice of Dr. Avila, Plaintiff immediately stopped taking Prempro.  Plaintiff took Prempro for a total of approximately 28 months.

Dr. Avila referred Plaintiff to a surgeon, Dr. Fredrick Tolin, who performed a biopsy on September 25, 1998. (*Id.* at 5-6.) Dr. Tolin diagnosed Plaintiff "with a special type of breast cancer known as invasive papillary adenocarcinoma which extended into the lobules." (*Id.* at 6.) Subsequent tissue testing revealed that Plaintiff's cancer was a "hormone-receptor-positive breast cancer," specifically "[e]strogen receptor 60[%], progesterone receptor 50[%]." (Hr'g Tr. at 96-97; *see also* R. 186, Ex. 43 at 17 (lab report).)

## II.    Expert Testimony of Dr. Elizabeth Z. Naftalis, M.D.

Defendant challenges the admissibility of the expert testimony of Dr. Naftalis, whom Plaintiff has designated as a case-specific expert on causation. (R. 153.) Plaintiff's theory of causation is one of promotion, rather than of initiation. According to Plaintiff, her use of E+P promoted, or fueled, the development and growth of certain pre-existing cancerous abnormalities in her breast. (R. 146, Pl.'s Resp. at 5, 16; *see also id.* at 4 ("Hormone therapy provided the fuel that enabled this plaintiff's breast abnormalities to grow and become a clinical tumor requiring treatment.").) Plaintiff does not argue that her use of E+P created the abnormalities in the first instance.

If permitted to testify, Dr. Naftalis would opine that Plaintiff's "ingestion of E+P was a substantial contributing factor in her development of hormone dependent breast cancer. Were it not for her use of combination hormone therapy, it is my opinion . . . that Mrs. Baldonado would not have suffered hormone positive invasive breast cancer." (Expert Report at 43.) To arrive at her opinions, Dr. Naftalis performed a differential diagnosis, or casualty assessment, which she explains as follows:

In assessing causality in a particular case, I first look at the patient's breast cancer

risk profile, including her Gail Model score[4] to assess her overall risk for developing breast cancer generally . . . , irrespective of her use of E+P.

I then look at her risk factors for developing her particular hormone dependent breast cancer. The first and most important issue I consider involves identifying the source(s) of the hormones that were necessary for the growth and development of her tumor. Hormone dependent tumors will not grow and develop into clinical cancer in the absence of hormones. In identifying the most probable source of the hormones fueling the cancer, I look at whether the woman is hormone deficient (symptomatic) or hormone sufficient (asymptomatic). Women who are hormone deficient would be at a very low risk of ever getting a hormone dependent breast cancer unless they take E+P.

I then assess [] whether there is an alternative explanation for the woman developing breast cancer that does not involve . . . E+P as a substantial contributing factor. I look at the timing of her use of E+P and [] the development of her cancer to see if there was sufficient use of E+P to have caused the clinical presentation of breast cancer. I also look at ["mammographic" and "pathological"] evidence to see if that is consistent with E+P [as] a cause[.]

Finally, I look at what other risk factors might have made her susceptible to developing breast cancer as a result of her use of E+P.

(*Id.* at 30.)

Applying differential diagnosis to this case, Dr. Naftalis first concludes that, prior to starting E+P therapy, Plaintiff "had minimal susceptibility for developing breast cancer." (*Id.* at 30-31.) Dr. Naftalis bases her opinion on Plaintiff's general risk profile reflected in a Gail Model score, combined with a case-specific analysis of certain known risk factors: age at

---

[4]As Dr. Naftalis explained in her expert report, the Gail Model is "one tool [that doctors] use to assess a woman's five-year and lifetime risk of developing breast[.] This is a general risk assessment model that gives us a simple calculation that helps identify a woman's risk of developing breast cancer. This can be important as we try to determine which women have such a high risk that they should not expose themselves to breast cancer causes like E+P therapy. It is an important tool to counsel women and can be used to identify women at high risk and to try to reduce their risk. While it is very difficult to predict with certainty which women will actually be diagnosed with breast cancer, it is possible to determine what were the most likely and significant contributing causes for many breast cancers once diagnosed." (Expert Report at 17; *see also id.* at 17-42 (discussing various risk factors).)

menarche (first menstrual cycle) and menopause, existence of prior pregnancies, history of breast feeding, use of oral contraception, family history, breast density, age, existence of benign breast disease with atypia, obesity, and alcohol use. (*Id.* at 30-36 (discussing and analyzing these factors).)

Dr. Naftalis considered the pathology of Plaintiff's breast cancer, and sought to identify any sources of hormones that would have been sufficient to promote its development. She concludes that none of the risk factors discussed above could have provided a sufficient source of hormones in Plaintiff's case. Based on her examination of Plaintiff's medical records, including symptomology, Dr. Naftalis opines that, in her clinical judgment, Plaintiff was hormone deficient and therefore lacked sufficient endogenous hormones to fuel the growth of her breast cancer.

Dr. Naftalis then concludes that "Mrs. Baldonado's use of E+P is by far the most significant, if not the only real source, of hormonal stimulation for this cancer." (*Id.* at 42.) She summarizes her reasoning as follows:

> As a hormone deficient woman, no other risk factor would account for any current source of hormones. Her deficiency symptoms were present for several years before she took E+P and they improved after she took E+P. No other risk factor changed. There is no other risk factor that could act as an alternative explanation for the hormonal changes that would have been necessary to cause the growth and development of this cancer. Thus, absent ingestion of E+P, it is more likely than not that Mrs. Baldonado would not have developed the breast cancer at issue.

(*Id.*)

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert*[.]" *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698,

12

705 (7th Cir. 2009). "The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011).

District courts employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811-12 (7th Cir. 2012). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

13

**ANALYSIS**

Defendant presently seeks to exclude the expert testimony of Dr. Naftalis pursuant to Rule 702 and *Daubert*. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Defendant argues that Dr. Naftalis is not qualified to offer expert opinion on causation, and that she bases her opinion on unreliable methods and procedures.

## I.    Qualifications

As a threshold matter, Defendant challenges the qualifications of Dr. Naftalis to offer expert opinions on causation. *See* Fed. R. Evid. 702 (requiring that an expert be qualified "by knowledge, skill, experience, training, or education"). Defendant argues that Dr. Naftalis is neither an epidemiologist nor cell biologist, has not led clinical trials, and otherwise lacks the specialized knowledge or experience to opine on breast cancer causation. (R. 115, Def.'s Mem. at 22.)

Consistent with nearly every other court that has considered the issue, the Court rejects Defendant's challenge to Dr. Naftalis' qualifications to offer expert opinions on breast cancer causation. *See, e.g.*, *Krammerer v. Wyeth*, No. 04-CV-196, 2011 WL 5237757, at *3 (D. Neb. Nov. 1, 2011) (rejecting Wyeth's challenge to "Dr. Naftalis' credentials" as a specific causation expert); *In re Prempro Prods. Liab. Litig.*, Nos. 03-CV-1507, 04-CV-1169, 2007 WL 4189510, at *3 (E.D. Ark. Nov. 15, 2007) (holding that Dr. Naftalis "is qualified to testify that HRT more likely than not promoted Plaintiff's breast cancer"); *Kendall v. Wyeth*, No. 936-2010, 2012 WL 112609, at *11 (Pa. Super. Ct. Jan. 3, 2012) (affirming admission of Dr. Naftalis' expert testimony on specific causation). *Cf. McClure v. Wyeth*, No. 04-CV-23274, 2012 WL 930958, at

*2 (D.S.C. Mar. 19, 2012) (excluding testimony of Dr. Naftalis because the plaintiff "failed to respond" to the defendant's *Daubert* motion).

Dr. Naftalis is an academic and clinical surgeon and an oncologist, who specializes in the surgical evaluation and treatment of breast disease and breast cancer. (Expert Report at 1.) She has practiced medicine since 1988, and is a member of the American Board of Surgery, the American College of Surgeons, the American Society of Breast Disease, the Society of Surgical Oncology, and the American Society of Breast Surgeons. (*Id*.) Dr. Naftalis has treated patients in private practice, and later as a professor in the division of surgical oncology at the University of Texas Southwestern ("UT"). During this time, Dr. Naftalis "examined more than 2,000 patients per year for breast evaluations." (*Id.*)

Dr. Naftalis has served as an investigator and researcher on various projects involving breast cancer, and has received private funding for studies, including research on the cause of breast cancer. (*Id.* at 2.) One such study, conducted through the UT Southwestern Center for Breast Cancer, considered the environmental effects on the development of breast cancer. (*Id.*) Dr. Naftalis has also participated in a "gene susceptibility study which looked at environmental carcinogens and the ability for such carcinogens to cause gene changes in breast cells leading to breast cancer." (*Id.*)

Under these circumstances, the Court rejects Defendant's challenge to Dr. Naftalis' qualifications to offer expert testimony on the issue of causation.[5] Although Dr. Naftalis'

---

[5]In its motion, Defendant seems to suggest that Dr. Naftalis is unqualified because she is "semi-retired" and "last practiced medicine routinely almost seven years ago." (R. 115, Def.'s Mem. at 22.) Any such suggestion lacks merit. Dr. Naftalis received her medical degree in 1986, and practiced medicine for nearly two decades before she "left the active practice of medicine in 2004 to be a full time parent." (Expert Report at 2.) It is nonsense to suggest that

15

qualifications were beyond the scope of the *Daubert* hearing, Dr. Naftalis' thorough scientific

testimony at the *Daubert* hearing further evidenced her qualifications.

## II.     Reliability

Defendant also challenges the reliability of differential diagnosis upon which Dr. Naftalis

relies.  *See* Fed. R. Evid. 702 (stating that expert testimony must be the "product of reliable

principles and methods").  Defendant argues that differential diagnosis is not a "scientifically

reliable method of establishing the cause of a woman's breast cancer," and alternatively, is not

reliable as Dr. Naftalis applied the methodology to this case.  (R. 115, Def.'s Mem. at 1, 8.)

Defendant's challenge fails.

### A.     Overview of Differential Diagnosis

Differential diagnosis—more properly termed "differential etiology" in this case[6]—is a

process by which a "doctor rules in all the potential causes of a patient's ailment and then by

systematically ruling out causes that would not apply to the patient, the physician arrives at what

is the likely cause of the ailment."[7]  *Myers*, 629 F.3d at 644.  The physician need not rule out

---

Dr. Naftalis' focus on her family is relevant to her expert qualifications.  This is particularly true
in light of her extensive background, and the undisputed facts that Dr. Naftalis has maintained
her medical license, satisfied educational requirements, currently practices medicine part time,
and frequently serves as an expert witness on breast cancer causation.

[6]*See Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) ("The question here,
however, is not what Myers was suffering from but what caused his ailments, and a better term
to describe it is a 'differential etiology.'  Etiology is the study of causation.") (citing *Tamraz v.
Lincoln Elec. Co.*, 620 F.3d 665, 673-74 (6th Cir. 2010)).

[7]Dr. Naftalis explains differential diagnosis as follows:  "This is a process by which
doctors assess the cause of a particular . . . illness based on the patient's particular clinical
history.  This process allows for the physician to look at the possible explanations or causes for
the patient's condition and then to assess which are more [or less] likely . . . to be the cause . . . ."
(Expert Report at 30.)

16

every possible cause, but the "goal is to identify the last remaining, or most probable, 'ruled in' cause of a medical problem." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 903 (7th Cir. 2007) (observing that once the expert rules in the possible causes, the expert must then rule out "some of these possible causes . . . to the extent scientific evidence makes it appropriate to do so").

In assessing the reliability of an expert's differential diagnosis, the expert's mere reference to the technique generally "is not enough to automatically show that a reliable methodology was used." *Meyers v. Nat'l R.R. Pass. Corp.*, 648 F. Supp. 2d 1032, 1045 (N.D. Ill. 2009) (citing *Ervin*, 492 F.3d at 904). The expert must instead reliably "rule in" the ultimate cause, and "rule out" other potential causes. *See id. Accord Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 887 (10th Cir. 2005) (excluding expert testimony that "attempted to demonstrate specific causation without first demonstrating general causation"). "Both of these steps must be based on sufficient and reliable data for the methodology as a whole to be reliable." *Caraker v. Sandoz Pharm. Corp.*, 172 F. Supp. 2d 1046, 1048 (S.D. Ill. 2001) (citing Fed. R. Evid. 702); *see also Ervin*, 492 F.3d at 904 ("Under *Daubert*, expert opinions employing differential diagnosis must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out.'") (citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005)).

### B. General Challenge to the Reliability of Differential Diagnosis

Defendant first argues that differential diagnosis is not a "scientifically reliable method of establishing the cause of a woman's breast cancer" because medical science "does not know all of the causes of breast cancer," nor is the methodology widely accepted or utilized. (R. 115, Def.'s Mem. at 18.) This broad-based attack on differential diagnosis lacks merit. *See Scroggin*

*v. Wyeth*, 586 F.3d 547, 567 (8th Cir. 2009) (affirming admission of expert causation testimony that relied on differential diagnosis).

The Seventh Circuit has made clear that "[t]here is nothing controversial about" an expert employing differential diagnosis to assess causation. *Myers*, 629 F.3d at 644; *see also In re Prempro Prods Liab. Litig.*, 586 F.3d at 567. Courts in other hormone therapy cases have reached the same conclusion. *See, e.g.*, *Scroggin,* 586 F.3d at 566 (affirming admission of Dr. Naftalis' expert testimony on breast cancer causation that she based on differential diagnosis); *Loewen v. Wyeth, Inc.*, Nos. 03-CV-2166, 3240, 04-CV-1319, 1888, 2011 WL 6140889, at *3 (N.D. Ala. Nov. 2011) (concluding, with regard to Dr. Naftalis, that Wyeth's "initial allegation–that so-called differential diagnosis is not a reliable methodology, and therefore cannot be used to reach a conclusion as to the cause of an individual's cancer–is simply unfounded"); *Cross v. Wyeth Pharm., Inc.*, No. 06-CV-429, 2011 WL 3498305, at *4 (M.D. Fla. Aug. 20, 2011); *Hines v. Wyeth*, No. 04-CV-690, 2011 WL 2680718, at *4 (S.D. W.Va. July 8, 2011) (rejecting Wyeth's argument that differential diagnosis is inherently unreliable to determine the cause of breast cancer in hormone therapy cases) (citing *Scroggin*, 586 F.3d at 566 and *Rivera Adams v. Wyeth*, No. 03-CV-1317, 2010 WL 5072061, at *5 (D.P.R. Dec. 3, 2010) (citing *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 486 (1st Cir. 2010)); *Kendall v. Wyeth*, No. 936-2010, 2012 WL 112609, at *11 (Pa. Super. Ct. Jan. 3, 2012) (stating, as to Dr. Naftalis, that "[t]here is nothing scientifically novel about using deductive reasoning or differential diagnosis to conclude that [the plaintiff's] breast cancer was caused or promoted by the defendants' products").

Although differential diagnosis, as applied, may be unreliable in some circumstances,

"[t]he question of whether it is reliable under *Daubert* is made on a case-by-case basis, focused on which potential causes should be 'ruled in' and which should be 'ruled out.'" *Myers*, 629 F.3d at 644; *see also Ervin*, 492 F.3d at 904 ("Determining the reliability of an expert's differential diagnosis is a case-by-case determination."); *Hines*, 2011 WL 2680718, at *4 ("Inasmuch as potential causes of breast cancer can be 'ruled in,' the court finds that it is possible, in a given instance, to perform a reliable differential diagnosis to determine the cause of an individual's breast cancer, contrary to defendants' contention that such methodology is *per se* unreliable"); *Caraker*, 172 F. Supp. 2d at 1048 (observing that differential diagnosis "in the abstract, has been considered sound").

The Court accordingly rejects Defendant's general challenge to differential diagnosis, and proceeds to Defendant's case-specific arguments.

### C.   Case-Specific Challenge to the Reliability of Differential Diagnosis

Defendant next attacks the reliability of Dr. Naftalis' application of differential diagnosis in this case.  Specifically, Defendant argues that Dr. Naftalis failed to "rule in" hormone therapy, and failed to "rule out" other factors, as a but-for cause of Plaintiff's breast cancer.

#### 1.   "Ruling In"

Defendant contends that Dr. Naftalis failed to "rule in" hormone therapy as a possible cause of Plaintiff's breast cancer.  (R. 115, Def.'s Mem. at 8.)  Defendant offers two reasons in support of its argument:  (1) a well-regarded clinical study from the Women's Health Initiative ("WHI" Study"),[8] "precludes Dr. Naftalis" from ruling in Prempro as a cause of Plaintiff's breast

---

[8]According to Dr. Naftalis:  "WHI is a study that was undertaken in the United States on American women.  It was a . . . prospective randomized trial, which is basically taking two groups of women . . . . [T]he investigator doesn't know if they're giving the drug or the placebo,

cancer; and (2) Dr. Naftalis has not "produced any evidence identifying HT as a risk factor for developing papillary cancer – the specific type of cancer with which Plaintiff was diagnosed." (*Id.* at 8-9.)

### a.   Capacity to Cause Breast Cancer

According to Defendant, Dr. Naftalis has "no reliable epidemiological evidence [that Prempro] is capable of causing the injury at issue at the dose and duration at issue."  (*Id.* at 8.) Defendant offers a singular reason in support of its conclusion – the WHI Study "found no increased risk of any form of breast cancer in use of fewer than five years," and therefore Dr. Naftalis has "no reliable epidemiological evidence" establishing that Plaintiff's use of Prempro for 28 months is "capable of causing" her breast cancer.  (*Id.* at 8; *see also id.* at 9 (stating that the WHI Study "precludes Dr. Naftalis [] from reliably ruling in [Prempro] as a cause of Plaintiff's cancer").)

This argument lacks merit.  As an initial matter, Defendant does not address the numerous additional studies and bases upon which Dr. Naftalis relies in forming her opinions. *See Hines,* 2011 WL 2680718, at *5 (denying *Daubert* motion, where movant neither addressed the full range of the medical literature upon which the expert relied nor challenged the experts' "utilization of [that] literature in forming" causation opinions).  Defendant instead, as in *Hines*, simply claims that a singular study – here, the WHI Study – dictates the admissibility of expert

_____

and the patient doesn't know if they're receiving the drug or the placebo.  Then the two groups are taken and certain issues are looked at.  In the WHI, heart benefit was actually what was looked at.  And, then, there were some other factors that were also considered, such as thromboembolic events, breast cancer and some other risks that were thought to be associated with the drugs."  (Hr'g Tr. at 34); *see also In re Prempro Prods. Liab. Litig.*, 465 F. Supp. 2d 1113, at 116-17 (W.D. Ark. 2011) (providing overview of WHI); (Am. Compl. ¶ 41; Answer ¶ 41.)

testimony. *Id.* That is not a proper basis to exclude expert testimony under *Daubert*. *See id.* at *4 -5 (holding that to "the extent that [certain] studies conflict with the research relied upon by [the expert] . . . this goes to the weight rather than the admissibility of [the expert] testimony.").

Dr. Naftalis' expert report and her testimony at the *Daubert* hearing make clear that she relies on numerous studies other than the WHI Study, many of which post-date the WHI, in addition to her training and experience, in opining that Plaintiff's use of Prempro for 28 months is capable of causing her breast cancer. (Expert Report at 29 & n.69, 40-41 nn. 106-09; *see also* Tr. at 43 (risk becomes statistically significant at under two and a half years).) Dr. Naftalis discussed many of these studies at the *Daubert* hearing. (*See* Hr'g Tr. at 34-75; *see also* R. 189, Ex. 4 (Million Women's Study, 2003); Ex. 5 (Calle - American Cancer Society Study, 2009); Ex. 6 (Chlebowski - WHI, 2009); Ex. 7 (Chlebowski - WHI, 2010); Ex. 8 (Fournier, French Study, 2009); Ex. 9 (Bernstein Review, 2009); Ex. 10 (Narod Review, 2011); Ex. 11 (Taylor Review, 2011); Ex. 12 (American Cancer Society).) *Cf. Norris*, 397 F.3d at 885-86 (affirming exclusion of medical causation expert, where expert "did not rely on any epidemiological studies or other controlled studies" to support his theory of causation).

Furthermore, Dr. Naftalis does not "ignore[] the results" of the WHI, as Defendant contends. (R. 115, Def.'s Mem. at 2.) She discussed the WHI Study in both her expert report and at the *Daubert* hearing. (Hr'g Tr. at 34-35; *see also* Expert Report at 24-25.) Dr. Naftalis discussed many reasons why, in her opinion, the WHI Study may not be helpful as applied to this case, including: the WHI Study participants had a lower risk profile than Plaintiff; the study was ended prematurely; the duration of use findings did not distinguish between hormone-positive and hormone-negative cancers; and there was a high drop-out rate. (Hr'g Tr. at 35-40, 227-35.)

21

Despite these limitations, and acknowledging that not all studies agree with one another, Dr.

Naftalis nonetheless testified that the WHI Study does provide some valuable information in this

case. (*Id.* at 33-39.) In this regard, Dr. Naftalis addressed numerous post-WHI studies that have

"analyzed and re-analyzed" the WHI Study data and found an elevated risk of breast cancer in

short-term use of HT beginning as early as year two. (*Id.* 33-56 (quoting counsel's question to

which the witness ascribed).)

Before concluding, the Court briefly addresses Defendant's argument, raised in its reply

and elsewhere, that Plaintiff cannot show that use of Prempro for less than three years is capable

of causing breast cancer in light of the MDL Court's order in *Kuhn v. Wyeth*, 765 F. Supp. 2d

1113, 1115 (W.D. Ark. 2011). Throughout this litigation, Defendant has characterized the MDL

Court as holding categorically that no expert may reliably opine that short-term use of Prempro

can cause breast cancer. (*See, e.g.*, R. 115, Def.'s Mem. at 2 n.2 (arguing that Plaintiff's form of

cancer "would fall within the ambit of the MDL court's order regarding short-term use"); R. 160,

Def.'s Reply at 3 ("the MDL court already found [that] Prempro use for three years or less

cannot be 'ruled in' as a scientifically valid risk factor"); *id.* at 7 (stating that the MDL Court

"found [that] Prempro use for three years or less does not increase the risk of breast cancer"); R.

118 at 1 ("As the MDL court found last year, there is no reliable evidence that short-term use of

HT (three years or less) is a cause of invasive ductal breast cancer."); R. 159 at 7 ("But as the

MDL court already has established, Plaintiff's short-term use evidence, as a whole, is flawed,

inconsistent, and most importantly, unreliable."); Mar. 22 Educ. Hr'g Tr. at 50 ("So, my point is,

this is the first federal case where we have issues of fact and issues of science that are squarely

within what the MDL court has already decided."); *id.* at 51 ("we believe that this case fits

within that summary judgment order of the MDL court").)  Defendant's characterization of the

MDL Court's order goes too far and is misleading.

In *Kuhn v. Wyeth*, the MDL Court considered a very narrow and case-specific issue –

namely, whether one of the plaintiff's experts, Dr. Austin, could offer reliable testimony that

short-term use of Prempro causes breast cancer.  *See Kuhn*, 765 F. Supp. 2d at 1115 ("The issue

before the Court is whether Dr. Austin, an epidemiologist and Plaintiffs' general causation

expert, can testify reliably that short-term use of Prempro increases the risk of breast cancer.").

The MDL Court did not consider whether *any expert* could *ever* reliably opine that short-term

use of Prempro can cause breast cancer.  (*Cf.* R. 160, Def.'s Reply at 3 ("the MDL court already

found [that] Prempro use for three years or less cannot be 'ruled in' as a scientifically valid risk

factor").)

Furthermore, the MDL Court did not exclude Dr. Austin because his opinions were

contrary to the WHI Study.  Although the court discussed the study, it rejected Dr. Austin's

attempts to distinguish the WHI Study because his criticisms were inconsistent with his previous

testimony and were "hastily formed."  *Kuhn*, 765 F. Supp. 2d at 1119.  The court explained that

Dr. Austin previously relied heavily on the WHI Study, and offered no reliable science to

support his "newfound criticism."  *Id.* at 1118.  Indeed, his expert report contained no citations

whatsoever. *Id.* ("his report contained none").  Further, his testimony at the *Daubert* hearing

raised additional, significant reliability problems, as the MDL Court explained:

> [H]is short-term use report was written in about five hours at the behest and
> assistance of Plaintiffs' counsel.  Dr. Austin testified that he had never really
> thought about the short-term use issue before Plaintiffs' counsel presented it to
> him shortly before the recent *Daubert* challenge in Puerto Rico.  He testified, "[i]t
> had never been raised as an issue to me, is there an important, a biologically
> important and clinically important risk within three years.  It was just not an issue

that I had thought about."

Dr. Austin's testimony also revealed that the process was driven largely by the lawyers. He stated he relied on the lawyers "for help with some of the citations." When the Court asked what he meant by "citations," since his report contained none, Dr. Austin explained: "And then when I got them, I tried to go through and verify every one of the–every one of the things, and I didn't get all the way through the verification process by the time it had to go in, but I thought that I had relied on my memory well enough for the few that hadn't to be able to rely on them."

*Id.* at 1119.

The MDL Court's order in *Kuhn* is not dispositive or binding on the issue of the admissibility of Dr. Naftalis' expert testimony in this case. Indeed, as the MDL Court stated subsequent to *Kuhn*, the *Kuhn* decision did not find the science unreliable in the abstract, but rather concluded that Dr. Austin's methodology and proposed expert testimony was unreliable in that case. (*See* R. 181-6, *In re Prempro Prods. Liab. Litig.*, No. 04-CV-1507 (E.D. Ark. May 5, 2012).)

Furthermore, it is well-settled that the district court must assess the reliability of expert testimony "on a case-by-case basis." *Myers*, 629 F.3d at 644; *see also Kumho Tire Co.*, 526 U.S. at 152 (holding that a trial judge must consider "whether *particular* expert testimony is reliable") (emphasis added); *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, MDL No. 1373, 2004 WL 315148, at *6 (S.D. Ind. Jan. 2004) ("We cannot apply the *Daubert* factors in a vacuum; again, whether the expert testimony comports to the *Daubert* standard must be determined according to the facts and law of each case.").

For all of these reasons, the Court rejects Defendant's challenge to the reliability of Dr. Naftalis' process of "ruling in" Plaintiff's use of Prempro as a but-for cause of her breast cancer.

24

### b.      HT as a Risk Factor for Papillary Cancer

Defendant next contends that Dr. Naftalis has not "produced any evidence identifying HT as a risk factor for developing papillary cancer – the specific type of cancer with which Plaintiff was diagnosed." (R. 115, Def.'s Mem. at 9.) In support of this argument, Defendant relies solely on eight lines of Dr. Naftalis' deposition transcript, in which, according to Defendant, "Dr. Naftalis could not identify a single study that provides a relative risk number establishing HT therapy as a risk factor for papillary carcinoma." (*Id.* (citing Ex. 1 (Naftalis Dep. at 54:14-22).) That cited testimony is as follows:

> COUNSEL:          So can you identify for me right now a single study in your expert report or otherwise that tells me a relative risk number for papillary breast cancer?
>
> DR. NAFTALIS:     No. It doesn't talk about it specifically in relation to papillary, but it talks about E-positive/P-positive and the risk related to that.

(*Id.* (interposing objection omitted).) Based on this testimony, Defendant asserts that Dr. Naftalis' "inability to identify any link between HT and papillary cancer [renders her] methodology unreliable." (R. 115, Def.'s Mem. at 14.)

Defendant, however, presents this testimony out of context. When viewed in the appropriate context, Defendant's challenge plainly lacks merit under *Daubert*. Dr. Naftalis gave the cited testimony in the context of explaining, as she did at the hearing, that the promotion effect of hormone therapy on breast cancer *does not depend* on the histological type of the breast cancer. (Hr'g Tr. at 46-49.) Given the low incidence of papillary cancer, Dr. Naftalis testified that medical studies tend to "group" papillary cancers "with other special types of cancers that have similar favorable features." (*Id.*) These studies, as Dr. Naftalis described at the hearing,

"show a pretty high relative risk . . . when including papillary" in the group of cancers with favorable histological types. (*Id.* at 59-61.)

Furthermore, at the hearing, Dr. Naftalis credibly explained that "[i]t would be biologically implausible that [E+P] wouldn't have an effect" on hormone positive papillary cancers. (*Id.* at 62; *see also id.* at 16 (ER-positive cancers, regardless of type, are treated similarly with anti-hormonal therapy); *id.* at 79 ("papillary tends to be strongly hormone dependent").) Dr. Naftalis is not aware of any medical literature on the "issue of whether E+P causes ER-positive breast cancer which has found some difference based on whether [the cancer] a ductal or a lobular or a papillary [cancer]," nor has Defendant offered any. (*Id.* at 61 (quoting counsel's question).) All of the studies show that "there is a causal effect of E+P on ER-positive breast cancers." (*Id.*)

### c.        Conclusion

For all of the reasons discussed above, the Court rejects Defendant's challenge to the reliability of Dr. Naftalis' process of "ruling in" of Prempro as a possible cause of Plaintiff's breast cancer. Defendant is free to cross-examine Dr. Naftalis on the issues it raises. *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362-63 (7th Cir. 2001) (observing that "admissibl[ity] under the *Daubert* standard is different from the weight to be accorded" the expert testimony); *Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 254243, at *9 (N.D. Ill. Jan. 27, 2012) (denying *Daubert* challenge and holding that the movant could explore alleged weaknesses in expert's testimony "through vigorous cross examination at trial").

### 2.        "Ruling Out" Other Potential Causes

Even if Dr. Naftalis could reliably "rule in" Plaintiff's use of Prempro as a possible cause

of her breast cancer, Defendant argues that she cannot reliably "rule out" two other possible causes: Plaintiff's existing levels of endogenous estrogen and Plaintiff's risk characteristics.

### a. Endogenous Estrogen

Defendant argues that Dr. Naftalis "does not and cannot account for Plaintiff's endogenous estrogen." (R. 115, Def.'s Mem. at 12.) Because endogenous (natural) and exogenous (external) estrogens are equally capable of promoting the development of breast cancer (*see* Hr'g Tr. at 24-25), Defendant contends that Dr. Naftalis' resulting opinions are unreliable. In approaching Defendant's challenge, the operative question is not whether Dr. Naftalis did in fact account for Plaintiff's endogenous estrogen – she clearly did[9] – but rather, whether Dr. Naftalis did so *reliably.*

Defendant characterizes Dr. Naftalis' methodology as resting on an "assumption . . . that symptomatic menopausal women, unlike asymptomatic menopausal women, are 'hormone deficient' and thus do not produce enough hormones for a receptor-positive tumor to grow." (R. 115, Def.'s Mem. at 12-13.) This is a gross oversimplification. Dr. Naftalis explained in detail at the *Daubert* hearing that her opinions on hormone deficiency or sufficiency depend on "the individual woman," including her medical records and other "facts, especially facts about estrogen deficiency symptoms or does she have signs of estrogen sufficiency." (Hr'g Tr. at 80; *see also id.* at 174 ("depends on the facts of the case").) She described one case in which she was unable to opine that a woman lacked sufficient endogenous hormones to cause her breast cancer, despite the presence of menopausal symptoms. (*Id.* at 80-81.)

---

[9](*See, e.g.*, Hr'g Tr. at 79-95, 121; Expert Report at 22-24, 32.)

As applied to Plaintiff, Dr. Naftalis testified that she reviewed Plaintiff's medical records, including treatment notes and the clinical impressions and diagnoses of Plaintiff's treating physicians.  (R. 186, Ex. 43 (selected medical records).)  Dr. Naftalis also considered the progression, type, duration, and severity of Plaintiff's menopausal symptoms.  (Hr'g Tr. at 80-124, 138; Expert Report at 32.)  In addition to symptomology, Dr. Naftalis considered the "fact that [Plaintiff] didn't have a period for four months on Provera," which "suggests that she didn't have enough estrogen during those four months to build up the lining of her uterus to have the Provera cause the shedding of the lining."  (Hr'g Tr. at 93; *see also id.* at 179 (insufficient estrogen to cause bleeding).)  Dr. Naftalis also considered the marked improvement of Plaintiff's menopausal symptoms after she started Prempro, which "shows that her symptoms were from estrogen deficiency and, once you replaced it with the pill, her symptoms went away."  (*Id.* at 94.)

Although Dr. Naftalis relies on a "qualitative evaluation," rather than a quantitative assessment, Defendant offers no persuasive reason to suggest that her qualitative analysis lacks reliability for purposes of admissibility under *Daubert*.  (*Id.* at 173 ("Even though we didn't have a measurement of levels, we know from her symptomology and we know from the fact that she didn't have withdrawal bleeding.").  *Accord Scroggin*, 586 F.3d at 566-67 & n.12 (rejecting challenge to Dr. Naftalis' qualitative  methodology that associated estrogen deficiency with menopausal symptoms in the context of differential diagnosis).  Indeed, according to Dr. Naftalis, "it is generally accepted that in menopause, symptoms are the primary clinical sign that a woman is 'hormone deficient.'"  (Expert Report at 12); *accord Hines*, 2011 WL 2680718, at *5.

As Defendant notes, a September of 1994 blood test showed that Plaintiff had relatively normal hormonal levels. (R. 115, Def.'s Mem. at 13.) This singular blood test does not, however, render Dr. Naftalis' clinical diagnosis of hormone deficiency unreliable. As an initial matter, Dr. Naftalis testified that this otherwise normal level of hormones might be a decrease from Plaintiff's previous levels and therefore "may be why she's having" menopausal symptoms during that time period. (Hr'g Tr. at 104.) More fundamentally, Dr. Naftalis explained that the blood test occurred while Plaintiff was in perimenopause, a time when a woman's ovaries begin to shut down, often causing "surges" of hormones and intermittent menopausal symptoms. (*Id.* at 82-83, 104.) Because Plaintiff was perimenopausal, Dr. Naftalis was not "surprised to see at that point that her hormones were in the normal range." (*Id.* at 178.) In Dr. Naftalis' words:

> [I]n perimenopause, you get surges of hormones. And if you look at [Plaintiff's] history, it's consistent with that. She was amenorrheic from August '93 to January of '94; then had the heavy period and was having regular periods, again, from January to June; and, then, no period in July and a normal period, again, in August. [T]his test was – done in September – September 14th. So, she had just had a normal period the month before. So, I'd still say she was perimenopausal, but probably had enough estrogen to fuel a cycle the month before.

(*Id.* at 90-93; *see also id.* at 82-83, 91-93, 104, 178 (further describing Plaintiff's medical history).)

Under these circumstances, Defendant's challenge goes to the weight, not the admissibility, of Dr. Naftalis' expert testimony. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (noting "the question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding [her] conclusions and the facts on which they are based"). Defendant is free to

cross examine Dr. Naftalis at trial on the results of this blood test.

**b.      Breast Density, Body Weight, and Absence of Prior Pregnancy**

Defendant next argues that Dr. Naftalis "made no attempt to 'rule out' significant risk factors specific to Plaintiff," namely her breast density, body weight, and absence of any prior pregnancy. (R. 115, Def.'s Mem. at 10-12.) Acknowledging that Dr. Naftalis "identified" certain risk factors, Defendant contends that she "summarily dismiss[ed] each of them without any meaningful explanation of why the risk factor was ruled out, or how it was ruled out." (*Id.*) The Court disagrees.

First, as a threshold matter, Defendant's argument amounts to somewhat of a red herring. Plaintiff's theory of causation is one of promotion, rather than initiation. Dr. Naftalis sets out to identify sources of sufficient hormones that could have fueled Plaintiff's hormone-dependent breast cancer. As she explained at the *Daubert* hearing, none of these risk factors is a source of sufficient hormones. (Hr'g Tr. at 121, 130, 139-40; *see also* Expert Report at 42 ("As a hormone deficient woman, no other risk factor would account for any current source of hormones.")); *accord Scroggin*, 586 F.3d at 567 (observing that Dr. Naftalis' discussion of "possible risk factors" was "not necessary to the formation" of her opinion on the source of hormones necessary for the promotion of the plaintiff's breast cancer). With regard to obesity specifically, Dr. Naftalis explained, with reference to scientific studies, that obesity is not a risk factor for women who take E+P. (Hr'g Tr. at 137-38.)

Second, to the extent it is relevant, Dr. Naftalis identified and discussed each of these risk factors in her expert report, as well as at the *Daubert* hearing. (Expert Report at 30-36; Hr'g Tr. at 120-40.) Defendant may, if otherwise appropriate, explore Dr. Naftalis' analysis of these risk

factors on cross-examination at trial. *See In re Prempro Prods. Liab. Litig*, Nos. 03-CV-1507, 05-CV-163, 2006 WL 2414062, at *3 (E.D. Ark. Aug. 21, 2006) ("[W]hile both reports are somewhat conclusive, rather than explanatory, I cannot say that either expert used improper methodology. . . . Their conclusions can be tested during cross-examination.").

### c. Conclusion

For all of the reasons discussed above, the Court rejects Defendant's challenge to the reliability of Dr. Naftalis' process of "ruling out" possible alternative causes of Plaintiff's breast cancer.

## CONCLUSION

The Court denies Defendant's motion to exclude the expert testimony of Dr. Naftalis.

Dated: May 31, 2012

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**