## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 4312 | **DATE** | 8/6/2012 |
| **CASE TITLE** | Baldonado vs. Wyeth | | |

**DOCKET ENTRY TEXT**

The Court denies the remainder of Defendant's motion to exclude the expert opinions of Dr. Suzanne Parisian [94]. The parties should carefully review the enclosed order together with the Court's prior order on the admissibility of Dr. Parisian's anticipated testimony [239].

■[ For further details see text below.]

Notices mailed by Judicial staff.

## STATEMENT

In advance of trial, Defendant Wyeth moves to exclude the expert opinions of Dr. Suzanne Parisian, M.D. pursuant to Rule 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The Court previously ruled in part on the motion. (R. 239.) As explained below, the remainder of the motion is denied.

**I. Background**

Plaintiff Jo Belle Baldonado was diagnosed with breast cancer while she was taking Prempro, a prescription hormone therapy medication that Defendant Wyeth designed, manufactured, and marketed. Alleging that Prempro caused her breast cancer, Plaintiff filed the present civil action against Defendant. In her Complaint, Plaintiff alleges, among other things, that Defendant breached its duty to adequately test and study the relationship between Prempro and breast cancer, particularly in light of certain safety signals, and that this breach resulted in Defendant's failure to discover and thus adequately warn about the link between Prempro and breast cancer.

The parties agree that to prevail on this claim, Plaintiff must prove that Defendant breached the applicable standard of care. *See, e.g.*, *Carrizales v. Rheem Mfg. Co., Inc.,* 226 Ill. App. 3d 20, 44-45, 168 Ill. Dec. 169, 89 N.E.2d 569 (Ill. App. Ct. 1991) (standard of care must be "relevant in terms of time and conduct"); *accord Ennenga v. Starns*, 677 F.3d 766, 777-78 (7th Cir. 2012) (discussing elements of negligence under Illinois law). This necessarily requires Plaintiff to establish what the applicable standard of care was in the industry at the relevant time. In an attempt to do so, Plaintiff has proffered the expert testimony of Dr. Suzanne Parisian, a medical doctor and former medical officer with the Food and Drug Administration ("FDA").

| | Courtroom Deputy Initials: | KF |
|---|---|---|

Dr. Parisian holds a medical degree from the University of South Florida and both a bachelor's and master's degree in biology from the University of Central Florida. (Tr.[1] at 6.) At the FDA, Dr. Parisian began as a medical officer in the Office of Health Affairs. (*Id.*) She later served as a medical officer and then chief medical officer in the Office of Device Evaluation. (*Id.* at 7.) While at the FDA, Dr. Parisian received training on FDA regulations and the concept of pharmacovigilence, which refers to a drug maker's obligation to monitor and update information relating to its drugs. (*Id.*; *see also id.* at 77.) In 2001, Dr. Parisian published a book entitled "FDA: Inside and Out," which she testified provides "guidance for manufacturers and for situations like this. It's just a reference book about the FDA." (*Id.* at 8.) After leaving the FDA, Dr. Parisian founded a consulting company through which she advises drug companies on matters relating to the FDA. (*Id.* at 9-10.) Dr. Parisian has testified as an expert witness in numerous trials, including numerous times in trials involving hormone therapy.

If permitted to testify, Dr. Parisian would opine that Defendant "breached the standard of care by failing to act as a reasonable drug company [would] in the same or similar circumstances including by failing to follow up on safety signals with breast cancer studies." (R. 318, Pl.'s Post-Hr'g Br. at 6.) Specifically, Dr. Parisian would testify that "Wyeth could have and should have done additional studies on E+P because (a) there were sufficient safety signals or red flags to justify such studies being done and (b) a reasonable drug company should respond to such signals with studies." (*Id.* at 9.) As a result of Defendant's alleged failure to undertake adequate study and/or testing, Dr. Parisian would conclude that "Wyeth's warnings were inadequate." (*Id.* at 10.)

On February 21, 2012, Defendant moved *in limine* to exclude Dr. Parisian's testimony under Rule 702 and *Daubert*. The Court subsequently granted the motion in part, denied the motion in part, and took one issue under advisement pending a *Daubert* hearing – namely, whether Dr. Parisian has a reliable basis to opine on the applicable standard of care for her "failure to test" opinions. (R. 239.) The present order is limited to that issue. The Court held the *Daubert* hearing on June 21, 2012, at which Dr. Parisian offered extensive testimony. The parties have since filed post-hearing briefs. (R. 296, 318.)

## II. Legal Standard

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert*[.]" *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable[.]" *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Ortiz v. City of Chi.*, 656 F.3d 523, 526 (7th Cir. 2011).

District courts employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist

---

[1] Citations to "Tr." refer to the transcript of the *Daubert* hearing that took place on June 21, 2012.

the trier of fact in understanding the evidence or to determine a factual issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *see also Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811-12 (7th Cir. 2012). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152). "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000); *accord Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data[.]").

## III. Analysis

Defendant argues that the "Court should exclude the testimony of Dr. Suzanne Parisian because she fails to identify an objective source for her methodology or opinions." (R. 296, Def.'s Post-Hr'g Br. at 4.) Specifically, Defendant argues that "Dr. Parisian opines that Wyeth did not do what a reasonable pharmaceutical company should have done to test its hormone therapy ('HT') medications[,] but she has failed to point to any objective standard against which to judge the reasonableness of Wyeth's conduct." (*Id.*); *see also Daubert*, 509 U.S. at 590 (stating that expert opinion must be more than "subjective belief or unsupported speculation"). Plaintiff responds that Dr. Parisian bases her opinions on her knowledge of the FDA regulatory scheme, her experience and training, applicable industry standards and customs, and Defendant's internal policies and procedures. (R. 318, Pl.'s Post-Hr'g Br. at 5.) For the reasons set forth below, and based on Dr. Parisian's testimony, considered together with the parties' briefs and the record, the Court finds that Dr. Parisian's "failure to test" opinions have a sufficiently reliable basis to qualify for admission under Rule 702 and *Daubert*.

Dr. Parisian approaches her expert analysis through the lens of the FDA regulatory scheme. (Tr. at 12, 26, 37-39, 44-47, 93-94, 109-11); *see also Rucker v. Norfolk & Western Ry. Co.*, 77 Ill.2d 434, 536-37, 33 Ill. Dec. 145, 396 N.E.2d 534 (1979) (holding that federal standards concerning construction of petroleum gas tank cars is admissible to establish standard of care in action based on tank explosion); *accord In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009) ("A lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry."). At the hearing, Dr. Parisian demonstrated expert knowledge and understanding of the relevant FDA regulations and the obligations that those regulations impose on drug companies. *Accord In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 191 (concluding that Dr. Parisian's testimony concerning "general FDA regulatory requirements and procedures" would assist the jury). She discussed certain specific regulations, and testified that the regulations require a drug company to provide accurate and adequate safety warnings, which necessarily entails that pharmaceutical companies undertake a process called "pharmacovigilence." (Tr. at 7, 21-22, 39.)

According to Dr. Parisian,

> pharmacovigilence is required of any [drug] manufacturer selling a product in the United States[.] [O]nce it's approved, they continue to monitor what occurs with their drugs. They have groups of people that are looking at the literature, monitoring the literature; looking at their complaint reports; looking at adverse event reports to identify a safety signal. Something that may be occurring with the drug that's not adequately addressed in the labeling or the information; something that may need to be either studied or evaluated. And, then, they have to make a determination at the company whether to update the labels or warnings, what you need to tell a physician or a patient.

(*Id.* at 21-22.) Pharmacovigilence is an "accepted" and "normal" practice in the pharmaceutical industry that has existed since at least 1969. (*Id.* at 22, 219.) Dr. Parisian explained that the FDA regulations require drug

companies to adopt pharmacovigilance protocols concerning how to respond to safety signals. (*Id.* at 42-45.) If the drug company then identifies a safety issue, the company must take appropriate action to ensure the continued accuracy of its safety warnings and product labels. (*Id.*)

Despite the existence of relevant FDA regulations, Dr. Parisian testified that the regulations do not prescribe the specific manner in which a drug company can satisfy its obligation to have an accurate and adequate label. (*Id.* at 93 ("[The regulations] don't describe the study because there's too many types of drugs to describe a specific study. . . . [T]he regs themselves do not describe the type of study because they allow the manufacturer, who is the most knowledgeable, to design the types of studies to ensure they make an accurate label.").) The manner in which a drug company satisfies its obligation to have an accurate and adequate label is largely "up to the manufacturer." (*Id.* at 94 ("it's up to the manufacturer to do what is necessary in order to make sure they have an adequate label"); *see also id.* at 22 ("The FDA requires that they have a process, but . . . it is every company's role to determine how to do this."); *id.* at 26 ("the way to finally do the study is up to the manufacturer"); *id.* at 110 (stating that each drug manufacturer is "the expert" on its drugs).) Dr. Parisian offered testimony about how drug companies monitor their products and the different ways in which they can do so and conduct appropriate follow up. (*Id.* at 25-26 ("[T]here's a lot of different ways to follow up on a safety signal. The FDA doesn't specify the way to do it. That's the company's determination as to how they're going to follow up.").)

Defendant construes the absence of a specific regulatory prescription as proof that no objective standard of care exists. (R. 296, Def.'s Post-Hr'g Br. at 21.) Indeed, Defendant argues that the "process of complying with FDA requirements is within the subjective discretion of each drug company." (*Id.*) Even though, as Dr. Parisian testified, each drug company may largely design its own safety protocols, this discretion does not preclude the existence of an objective standard of care against which to judge Defendant's conduct. According to Dr. Parisian, the type of study that a manufacturer must undertake, if at all, depends on the circumstances of each case, including the nature of any safety signals about which the manufacturer is aware. (*Id.* at 113 (the standard is "not subjective"); *see also id.* at 187-91.) As Dr. Parisian observed, the FDA cannot practically design a regulatory scheme to cover every possible safety signal or every possible medication. *Accord Wyeth v. Levine*, 555 U.S. 555, 579, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009) ("The FDA has limited resources to monitor the 11,000 drugs on the market, and manufacturers have superior access to information about their drugs, especially in the postmarketing phase as new risks emerge."). The regulations instead leave to the industry and each company the responsibility of developing practices and standards of study and testing to satisfy their obligation to produce an adequate label under the FDA regulations. *Id.* (discussing the "premise" of federal law in this area that "manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times"); (*see also* Tr. at at 110 (testifying that the manufacturers are "the experts, and they're the ones responsible for the adequacy of the label).) *Accord Ruffiner v. Material Serv. Corp.*, 116 Ill.2d 53, 58, 106 Ill. Dec. 781, 506 N.E.2d 581 (1987) ("evidence of standards may be relevant . . . even though the standards have not been imposed by statute or promulgated by a regulatory body and therefore do not have the force of law").

To elucidate the applicable standard of care in the absence of specific regulatory prescriptions, Dr. Parisian brings to bear her experience and training on the issue. *See, e.g., Baldonado v. Wyeth*, No. 04 C 4312, 2012 WL 1802066, at *8 (N.D. Ill. May 17, 2012) (rejecting *Daubert* challenge to the reliability of the expert's opinion on the applicable standard of care, reasoning that the expert "may reliably draw on his vast experience in this area, and his expert knowledge of federal and industry regulations, to opine on the standard of care"); *In re Yasmin and Yaz (Drospirenone) Mktg Litig.*, MDL No. 2100, 2011 WL 6740391, at *12 (S.D. Ill. Dec. 22, 2011) (stating that the plaintiffs "may ask a witness, who has familiarity with other pharmaceutical companies, if that witness is familiar with custom and practice in the industry"); *Harmes v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 903-04 (N.D. Ill. 2001) ("[T]estimony on the general standards of care in the industry would come from [the expert's] professional knowledge . . . . This is classic expert testimony."). Dr. Parisian repeatedly emphasized during her testimony that her opinions are not subjective, but are instead "based on training and experience and

having done the same process." (*Id.* at 191; *see also id.* at 37-40, 50, 67-71, 75); *accord Trs. of Chi. Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall and Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."); *Jordan v. City of Chi.*, No. 08 C 6902, 2012 WL 254243, at *3 (N.D. Ill. Jan. 27, 2012) ("An expert may be qualified to render opinions based on experience alone.") (citing Fed. R. Evid. 702 – adv. comm. notes ("In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony.")).

In arriving at her expert opinions, Dr. Parisian testified that she employed the same methodology that she used at the FDA. (Tr. at 11, 19-20, 190-91 ("I'm doing the same thing -- if Wyeth came and sat in my office and said, 'Dr. Parisian, what should we do next with this information?' I would do the exact same process. And I would say, 'Based on your data, this is what you should do. In terms of breast cancer risk, these are the types of studies you should do.'
I would have done that at the FDA; I do it for manufacturers; and, I would do it here for the Court. . . . This is what an FDA regulatory medical officer does.").)

At the FDA, Dr. Parisian "was required to learn the regulations" and "was taught about both the U.S. Code and the CFR back beginning in 1991." (*Id.* at 12; *see also id.* at 37.) She received training on safety signals and to "help coordinate and work with drug companies as to what to do in reaction to safety signals." (*Id.* at 37 (quoting counsel's question to which the witness agreed); *see also id.* at 37-39 (describing training).) Dr. Parisian explained at the hearing that the FDA trained her to evaluate "the magnitude and number of safety signals" and then "work with the industry as to how to develop a specific type of study to answer the safety issue that was raised." (*Id.* at 37; *see also id.* at 71-75, 93.) Dr. Parisian pointed to specific cases that she worked on as a medical officer and stated: "I had hands-on training with safety issues having to look at adverse events, literature using regulations . . . I looked at the filings of these companies, what they were providing to the FDA . . . and figured out how to protect safety." (*Id.* at 38.)

Beyond this training, Dr. Parisian testified that she has experience "personally working with drug companies and medical device companies looking at safety signals, organizing studies and then actually impacting the warnings provided or the representations provided about the product." (*Id.* at 97 (quoting counsel's question to which to witness ascribed).) Dr. Parisian has developed studies in response to safety signals (*see id.* at 72, 108), and has "taught medical officers how to" address safety issues by selecting an appropriate type of study in a specific circumstance. (*Id.* at 72.) Dr. Parisian also has experience examining safety data and making recommendations concerning the "next step that a manufacturer would need to do." (*Id.* at 73.) During her testimony, Dr. Parisian described, among other experiences, two examples of her pharmacovigilence work: (1) isolating a specific medical device as the cause of injury following safety signals, ultimately leading to a changed safety label (*see id.* at 70 ("We had the industry involved. So, it was based on my training as a physician, as a pathologist, and it triggered a follow-up safety action. And we had to look at the adverse event reports, see if other people were reporting it as causes of death in the adverse event reports."); and (2) "creating a protocol for the manufacturers" of a new treatment for AIDS patients, including setting up a clinical trial. (*Id.* at 71-73.)

Even though Dr. Parisian did not work with hormone therapy products at the FDA, as Defendant points out, neither was her experience at the FDA limited to one type of drug or device. (R. 296, Def.'s Post-Hr'g Br. at 10; *see also, e.g.,* Tr. at 105-28.) Dr. Parisian testified that she worked on numerous medical devices and drugs and worked closely with groups at FDA that devoted all of their time to drug approval. (*Id.* at 212.) Although "how to follow up" to a safety signal may vary from drug to drug, so too does it vary based on the nature of the safety signal and myriad other circumstances that are unique to each case. (*Id.* at 22 ("The mechanisms for following up really depends on what the safety signal is."); *see also id.* at 100.) Defendant makes no argument that a different standard of care applies to the manufacturers of hormone therapy products specifically, as opposed

to manufacturers of other pharmaceutical products that Defendant and others manufactured during the relevant time period.

Dr. Parisian also testified that she is familiar with industry practice and custom during the relevant time period. *See Jablonski v. Ford Motor Co.*, 2011 IL 110096, at ¶¶ 90-91 (2011) ("[E]vidence of industry standards . . . has always been relevant to determining whether a defendant has exercised reasonable care") (citing *Texas & Pacific Ry. Co. v. Behymer*, 189 U.S. 468, 470, 23 S. Ct. 622, 47 L. Ed. 905 (1903) ("What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.")). This experience includes familiarity with how the FDA has interacted with drug companies, how drug companies have responded to safety issues, and how companies with drug companies and practices in the industry that culminated in the written PhRMA Code (1995). (*Id.* at 58-63, 82-83, 95-97, 217-18.) Finally, Dr. Parisian reviewed Defendant's internal safety protocols, which "serve a useful function in establishing the proper standard of care to be exercised by the defendant," *Spence v. Comm. Edison Co.*, 34 Ill. App. 3d 1059, 1068, 340 N.E.2d 550, particularly in light of Wyeth's dominance in the industry during the relevant time. (Tr. at 62-64.)

Under these circumstances, the Court finds that Dr. Parisian has a sufficiency reliable basis for her "failure to test" opinions in this case. *See Hanahan v. Wyeth, Inc.*, No. 04-CV-1255, 2012 WL 2395881, at *9 (E.D. Mo. June 25, 2012) ("[Dr. Parisian has] specialized knowledge of the regulatory procedures, pharmaceutical labeling, FDA standards and practice, governmental statutes and regulations, pharmaceutical industry customs and practices, administrative rules, internal policies, and other factors that can assist the trier of fact in determining the adequacy of Defendants' label warnings. Defendants' challenge . . . goes more to the weight, rather than the admissibility, of the evidence."); *Loewen v. Wyeth, Inc.*, Nos. 03-2166, 04-1888, 03-3240, 04-1419, 2011 WL 6140908, at *2 (N.D. Ala. Nov. 14, 2011) ("The court finds that Dr. Parisian's testimony is based upon her experience with the FDA and FDA requirements. The court finds as such she is competent to testify with respect to FDA's rules, regulations and requirements both pre and post approval by FDA of a drug. She is likewise qualified to testify whether defendants complied with FDA's rules, regulations and requirements and the reasonableness of defendants' conduct in light of FDA's rules, regulations and requirements."); *accord In re Yasmin and Yaz (Drospirenone) Mktg Litig.*, 2011 WL 6740391, at *14 (holding that expert's past experiences at the FDA and otherwise "qualifies him to testify about a drug company's duty of care under state law").

Dr. Parisian's testimony is subject to cross-examination. The Court has carefully reviewed the record in this case, including Dr. Parisian's testimony at the *Daubert* hearing, and although Defendant's challenges are significant, they go to the weight of Dr. Parisian's testimony, rather than to its admissibility at trial, for all of the reasons discussed above. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.") (citing *Daubert*, 509 U.S. at 596). Rule 702 and *Daubert* set forth the minimal requirements for admissibility, and as long as the expert crosses that minimum threshold – as Dr. Parisian does here – the weight to be accorded the expert's testimony is an issue properly left to the jury. *See Lapsley v. Xtek, Inc.*, — F.3d —, 2012 WL 3055865, at *12 (7th Cir. July 27, 2012) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## IV.     Conclusion

The remaining portion of Defendant's motion *in limine* to exclude the expert opinions of Dr. Parisian is denied. The Court reminds the parties to carefully review the Court's prior order on the admissibility of Dr. Parisian's anticipated testimony. (R. 239, Minute Order at 2 (precluding Dr. Parisian from offering "factual narrative" testimony and/or opinions on corporate intent and motivation, based on her review and interpretation of the record).) The Court will take up any additional objections at trial. *See Jonasson v. Lutheran Child & Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).